1   Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2   2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
3   Telephone: (310) 915-6628
Facsimile: (310) 915-9897
4   Email: RMoest@aol.com

5   *Counsel for Plaintiff*

6   [Additional Counsel on Signature Page]

7                **UNITED STATES DISTRICT COURT**
                 **CENTRAL DISTRICT OF CALIFORNIA**
8

9

10  HUGUES GERVAT, derivatively on
    behalf of THE WALT DISNEY
11  COMPANY,                                   Case No.:

12                  Plaintiff,

13

14        v.                                   **DEMAND FOR JURY TRIAL**

15  ROBERT CHAPEK, CHRISTINE M.
    MCCARTHY, KAREEM DANIEL,
16  SUSAN E. ARNOLD, MARY T.
    BARRA, SAFRA A. CATZ, AMY L.
17  CHANG, FRANCIS A. DESOUZA,                 **VERIFIED SHAREHOLDER**
    MICHAEL B.G. FROMAN, ROBERT               **DERIVATIVE COMPLAINT**
18  A. IGER, MARIA ELENA
    LAGOMASINO, CALVIN R.
19  MCDONALD, MARK G. PARKER, and
    DERICA W. RICE,
20

21

22                  Defendants,

23

24        and

25  THE WALT DISNEY COMPANY,

26                  Nominal Defendant.

27

28

---

                    Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Hugues Gervat ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant The Walt Disney Company ("Disney" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Robert Chapek ("Chapek"), Christine M. McCarthy ("McCarthy"), Kareem Daniel ("Daniel"), Susan E. Arnold ("Arnold"), Mary T. Barra ("Barra"), Safra A. Catz ("Catz"), Amy L. Chang ("Chang"), Francis A. deSouza ("deSouza"), Michael B.G. Froman ("Froman"), Robert A. Iger ("Iger"), Maria Elena Lagomasino ("Lagomasino"), Calvin R. McDonald ("McDonald"), Mark G. Parker ("Parker"), and Derica W. Rice ("Rice") (collectively, the "Individual Defendants," and together with Disney, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Disney, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and against Defendants Chapek, McCarthy, and Daniel for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Disney, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing

committed by the Individual Defendants from December 10, 2020 through November 8, 2022, inclusive (the "Relevant Period").

2.     Disney was founded in 1923 and operates as the world's largest entertainment group. The Company, among other things, engages in film and episodic television content production and distribution; sells and licenses film and television content to third-party television and subscription video-on-demand services; operates theme parks and resorts around the world; and sells consumer products.

3.     Most recently, and the primary focus of this action, the Company began offering direct to consumer ("DTC") streaming services through Disney+, Disney+ Hotstar, ESPN+, Hulu, and Star+.

4.     In February 2020, Defendant Chapek replaced Defendant Iger as Chief Executive Officer ("CEO") of Disney. Disney experienced substantial losses during Defendant Chapek's first eight months as CEO, primarily as a result of the widespread impact of the COVID-19 pandemic. However, at the same time, despite these challenges, Disney's recently launched Disney+ DTC streaming service—introduced under Defendant Iger's leadership—was flourishing.

5.     In October 2020, Disney announced a major reorganization of its media and entertainment operations. This change in structure marked a significant departure from Disney's historical reporting structure and generated considerable controversy internally at the Company. Prior to the reorganization, the Company had been organized into four reporting segments: (1) Media Networks; (2) Parks, Experiences, and Products; (3) Studio Entertainment; and (4) Direct-to-Consumer & International. Under Defendant Chapek's leadership, the Company underwent a restructuring, consolidating Disney's operations into only two reporting segments: (1) Disney Media and Entertainment Distribution ("DMED") and (2) Disney Parks, Experiences, and Products ("DPEP"). The new structure involved the centralization of power, moving it away from creative content-focused executives and into a new reporting group piloting DMED.

6.     The DMED segment, led by Defendant Daniel, included Disney+ and operated under the direct supervision of Defendant Chapek. DMED took on the responsibility of monetizing all Disney content globally, handling both distribution and advertising sales, as well as overseeing the operations of Disney's streaming services. Notably, both Defendant Daniel and Defendant Chapek were authorized to decide which platform the Company's content would be released on, whether it be a streaming service, a cable television network, or a traditional movie theater.

7.     On December 10, 2020, Disney hosted its 2020 Investor Day presentation, which aimed to provide investors with updates on Disney's current businesses, reorganization, and future plans. The 2020 Investor Day presentation placed a specific emphasis on Disney's DTC strategies.

8.     During the presentation, Disney provided new estimates for Disney+'s projected subscriber numbers and profitability for the end of fiscal year 2024. The Company stated that, by the end of fiscal year 2024, Disney+ was projected to have between 230 and 260 million total paid subscribers globally and would achieve full profitability. These projections largely served as the basis for Defendant Chapek's decision to reorganize the Company, focus on Disney's DTC strategies, and, in turn, place centralized control of Disney's content distribution decisions with Defendants Chapek and Daniel and the rest of the DMED team.

9.     Both Defendant Chapek and Defendant Daniel emphasized that the distribution decisions made by the DMED team would be driven by consumer behavior and tailored to best meet the needs of consumers.

10.    Throughout the Relevant Period, the Individual Defendants made a series of false and misleading statements to investors and the public about the overall health of the Company and the potential of Disney+. These statements failed to disclose that the reorganization of the Company allowed the Individual Defendants to engage in a deceptive cost-shifting scheme which concealed the true operational costs of Disney+.

11.     Specifically, the Individual Defendants utilized the newly established DMED segment to inappropriately transfer costs from the Disney+ platform to legacy platforms. As part of the scheme to present Disney+'s financial performance as more successful than it was, Defendants aired certain shows that were meant to be Disney+ originals first on legacy television networks like the Disney Channel. By doing so, a significant portion of the marketing and production costs of these shows was shifted away from Disney+ and onto the legacy platforms. Despite executing this cost-shifting scheme, Defendants repeatedly claimed during the Relevant Period that platform distribution decisions were based on various factors, such as customer preferences and what was commercially best for the business. The Individual Defendants' misrepresentations misled the investing public and artificially inflated the Company's stock price throughout the Relevant Period.

12.     The truth emerged on November 8, 2022, when the Company issued a press release disclosing Disney's financial results for both its fourth quarter and fiscal year ended October 1, 2022. Disney's DTC segment, including Disney+, reported a ***significant operating loss of $1.47 billion, in contrast to a $630 million loss in the same quarter the previous year***. Although the segment's revenue increased by 8% to $4.9 billion, it was overshadowed by the substantial losses. The Company also noted a decrease in its average revenue per Disney+ subscriber, primarily due to more customers opting for discounted bundles with the Company's other services. Notably, these bundled offerings made up approximately 40% of domestic subscribers, indicating that Disney relied on short-term promotional efforts to boost subscriber numbers, potentially compromising the platform's long-term profitability.

13.     The press release further revealed that the Company's sales reached $20.2 billion, falling approximately $1 billion short of analysts' projections, while earnings, excluding certain items, declined to 30 cents per share.

14.     On this news the Company stock price fell $13.15, or 13%, from a closing price of $99.90 per share on November 8, 2022 to close at $86.75 per share on November

9, 2022.

15.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (2) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (3) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (4) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

16.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while, during the Relevant Period, two of the Individual Defendants sold Company shares at inflated prices for combined total proceeds of over $14.8 million.

17.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Disney to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between December

2020 and November 2022, approximately 557,313 shares of Disney common stock were repurchased, costing the Company over $78.7 million. As the Company's stock was actually worth only $86.75 per share, the price at which it was trading when markets closed on November 9, 2022, the Company overpaid for repurchases of its own stock by over $30.3 million in total.

18.     Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls.

19.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former CEO, its former Chief Financial Officer ("CFO"), and its former Chairman of the DMED segment, to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

20.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Chapek's, Defendant McCarthy's, and Defendant Daniel's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of

the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25.     Venue is proper in this District because Disney's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of Disney. Plaintiff has continuously held Disney common stock at all relevant times.

### Nominal Defendant Disney

27.     Disney is a Delaware corporation with its headquarters at 500 South Buena Vista Street, Burbank, CA, 91521-0007. Disney's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "DIS."[1]

---

[1] The Company's fiscal year end is on the Saturday closest to September 30 and consists of fifty-two weeks with the exception that, approximately every six years, we have a fifty-three week year. During the Relevant Period, the relevant fiscal year end dates were as

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Defendant Chapek**

28.     Defendant Chapek served as the Company's CEO from February 2020 until he was terminated on November 20, 2022. Prior to his termination, Defendant Chapek spent almost thirty years working for the Company, holding various positions between 1993 and 2022. According to the proxy statement the Company filed with the SEC on February 6, 2023 (the "2023 Proxy Statement"), as of January 23, 2023, Defendant Chapek beneficially owned 27,931 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant Chapek owned approximately $2.9 million worth of Disney stock.

29.     For the fiscal year ending on October 1, 2022 (the "2022 Fiscal Year"), Defendant Chapek received $24,183,003 in total compensation from the Company. This included $2,500,000 in salary, $10,810,832 in stock awards, $3,750,020 in option awards, $6,750,000 in non-equity incentive plan compensation, and $372,151 in all other compensation. For the fiscal year ending on October 2, 2021 (the "2021 Fiscal Year"), Defendant Chapek received $32,464,293 in total compensation from the Company. This included $2,500,000 in salary, $10,215,466 in stock awards, $3,750,012 in option awards, $14,330,000 in non-equity incentive plan compensation, $1,358,505 in change in pension value and non-qualified deferred compensation earnings, and $310,310 in all other compensation.

30.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Chapek made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| August 31, 2021 | 10,587 | $182.00 | $1,926,834 |

Thus, in total, before the fraud was exposed, he sold 10,587 shares of Company stock on

---

follows: October 1, 2022 and October 2, 2021.

inside information, for which he received approximately $1,926,834 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

31.    The proxy statement the Company filed with the SEC on January 19, 2022 (the "2022 Proxy Statement") stated the following about Defendant Chapek:

**Qualifications**

Mr. Chapek contributes to the mix of experience and qualifications the Board seeks to maintain through his years of leadership experience and his role as Chief Executive Officer of The Walt Disney Company. Mr. Chapek's nearly 30 years at the Company have been marked by growth and transformation. Mr. Chapek has successfully implemented groundbreaking business models and identified new revenue streams to achieve business objectives and sustain long-term growth. As a result of this experience, Mr. Chapek brings to our Board valuable insights regarding the management of a complex, global organization with particular insights in global consumer products operations, film content distribution strategies, and complex development projects across Disney Parks, as well as experience in managing risks, ESG initiatives and implementing innovative technological business strategies. The Company has agreed in Mr. Chapek's employment agreement to nominate him for reelection as a member of the Board at the expiration of each term of office during the term of the agreement, and he has agreed to continue to serve on the Board if elected.

**Defendant McCarthy**

32.    Defendant McCarthy served as the Company's CFO from 2015 until she resigned in June 2023. Prior to her resignation, Defendant McCarthy spent 23 years working for the Company, holding various positions. According to the 2023 Proxy Statement, as of January 23, 2023, Defendant McCarthy beneficially owned 186,085 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant McCarthy owned approximately $19.7 million worth of Disney stock.

33.     For the 2022 Fiscal Year, Defendant McCarthy received $20,235,669 in total compensation from the Company. This included $1,980,000 in salary, $8,935,794 in stock awards, $3,375,042 in option awards, $5,820,000 in non-equity incentive plan compensation, and $124,833 in all other compensation. For the 2021 Fiscal Year, Defendant McCarthy received $21,729,215 in total compensation from the Company. This included $1,903,754 in salary, $6,922,854 in stock awards, $5,000,015 in option awards, $7,680,000 in non-equity incentive plan compensation, $103,152 in change in pension value and non-qualified deferred compensation earnings, and $119,440 in all other compensation.

34.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant McCarthy made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| January 15, 2021 | 4,139 | $173.00 | $716,047 |
| January 20, 2021 | 5,000 | $177.24 | $886,200 |
| January 25, 2021 | 25,000 | $172.00 | $4,300,000 |
| January 12, 2022 | 10,000 | $158.60 | $1,586,000 |
| January 13, 2022 | 10,000 | $158.00 | $1,580,000 |
| January 14, 2022 | 10,000 | $152.06 | $1,520,600 |
| January 18, 2022 | 15,342 | $151.54 | $2,324,926 |

Thus, in total, before the fraud was exposed, she sold 79,481 shares of Company stock on inside information, for which she received approximately $12.9 million in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

35.     The 8-K the Company filed with the SEC on June 6, 2023 stated the following about Defendant McCarthy:

McCarthy joined Disney in 2000 as Treasurer and became Chief Financial Officer in 2015. Prior to joining Disney, she was the Executive Vice President

and Chief Financial Officer of Imperial Bancorp from 1997 to 2000. She also held various executive positions in finance and planning at First Interstate Bancorp from 1981 to 1996. She serves on the Board of Directors of The Procter & Gamble Company and FM Global and is a trustee of the Carnegie Institution for Science. McCarthy has received numerous awards and has been named multiple times to Treasury & Risk's "100 Most Influential People in Finance" and was the recipient of Treasury Today's Adam Smith "Woman of the Year" Award in 2015 and was honored by the Entertainment Diversity Council in 2016 as one of the "Top 50 Most Powerful Women in Entertainment."

**Defendant Daniel**

36.    Defendant Daniel has been a long-time employee of Disney. According to Disney's biography of Defendant Daniel,[2] among other things, he previously:

[S]pearheaded transformation across the Company through leadership roles in Consumer Products, Games and Publishing; Walt Disney Imagineering; The Walt Disney Studios; and Corporate Strategy.

As President of Consumer Products, Games and Publishing, he led the teams creating and delivering products across a variety of channels, including the Company's direct-to-consumer ecommerce business, shopDisney. He also managed the world's largest consumer products licensing organization, oversaw the digital and mobile games business, and was responsible for Disney Publishing Worldwide.

37.    Prior to his dismissal from Disney on November 21, 2022, Defendant Daniel served as the first and only Chairman of Disney's DMED segment. In its biography of Defendant Daniel, the Company states that DMED is "responsible for driving the overall growth and profitability of The Walt Disney Company's global media businesses and delivering its unparalleled storytelling to fans and families around the world." The Company's biography of Defendant Daniel further states:

Mr. Daniel's scope includes global P&L management and operation of the Company's streaming services – Disney+, Hulu, ESPN+, and Star+ – which combined have more than 200 million subscriptions; its portfolio of must-watch linear television channels, including ABC, Disney Channel, ESPN,

---

[2] https://thewaltdisneycompany.com/app/uploads/2020/07/Kareem-Daniel_Bio.pdf

Freeform, FX, and National Geographic; its ABC owned-stations; its industry-leading advertising sales business; Disney Music Group; content licensing and distribution; and theatrical film distribution for the Company's world-class entertainment studios – Disney, Walt Disney Animation Studios, Pixar Animation Studios, Marvel Studios, Lucasfilm, 20th Century Studios, and Searchlight Pictures.

**Defendant Arnold**

38.     Defendant Arnold served as a Company director from 2007 to April 3, 2023 and as Chairman of the Board from December 31, 2021 to April 3, 2023. Prior to her departure, Defendant Arnold served as Chair of both the Executive Committee and the Governance and Nominating Committee. According to the 2023 Proxy Statement, as of January 23, 2023, Defendant Arnold beneficially owned 18,937 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant Arnold owned approximately $2 million worth of Disney stock.

39.     For the 2022 Fiscal Year, Defendant Arnold received $571,981 in total compensation from the Company. This included $214,327 in fees earned or paid in cash, $289,953 in stock awards, and $67,701 in all other compensation. For the 2021 Fiscal Year, Defendant Arnold received $436,922 in total compensation from the Company. This included $190,000 in fees earned or paid in cash, $189,607 in stock awards, and $57,315 in all other compensation.

40.     The 2022 Proxy Statement stated the following about Defendant Arnold:

**Qualifications**

Ms. Arnold contributes to the mix of experience and qualifications the Board seeks to maintain through her experience as an executive of Procter & Gamble and her public company board experience. At Procter & Gamble, Ms. Arnold was a senior executive responsible for major consumer brands in a large, complex retail and global brand management company. As a result of this experience, Ms. Arnold brings to our Board in-depth knowledge of brand management and marketing, environmental sustainability, product and business development, international consumer markets, finance and executive and risk management, including executive compensation and management

leadership. Ms. Arnold is also our longest tenured member of the Board, bringing continuity to balance Board refreshment.

**Defendant Barra**

41.     Defendant Barra has served as a Company director since 2017. She is also a member of the Compensation Committee. According to the 2023 Proxy Statement, as of January 23, 2023, Defendant Barra beneficially owned 229 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant Barra owned approximately $24,203 worth of Disney stock.

42.     For the 2022 Fiscal Year, Defendant Barra received $361,657 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $236,657 in stock awards. For the 2021 Fiscal Year, Defendant Barra received $364,607 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $189,607 in stock awards, and $50,000 in all other compensation.

43.     The 2023 Proxy Statement stated the following about Defendant Barra:

**Notable Experience Aligned with Disney's Strategy and Key Board Contributions**
- Ms. Barra has deep experience in strategy and brand evolution through her role in driving General Motors' transformation to electric and autonomous vehicles, which provides a critical perspective on the Board throughout the Company's own strategic progression and embracing of technological change and shifts in consumer sentiment[.]
- Ms. Barra's position as Chief Executive Officer of General Motors affords her the ability to provide invaluable insight to both the leadership team and fellow Board members on long-term strategic decision making, large-scale cost rationalization and organizational restructuring and maintaining strong brand leadership[.]
- She brings meaningful experience in human capital management and executive compensation-related matters in her role on the Company's Compensation Committee, where she focuses on aligning incentive structures with shareholder value creation and execution of long-term strategic priorities[.]

 **Other Key Skill Sets**

- Overseeing and managing diverse and inclusive executive teams and a sizeable global workforce, with an emphasis on development and marketing of technology-based consumer-facing products and managing supply chain and inflationary product environments through her various executive roles at General Motors[.]
- Governance and public policy thought leadership, understanding of worldwide consumer markets and risks facing large public companies with complex retail operations through her role as chair of the Business Roundtable[.]

**Defendant Catz**

44.     Defendant Catz has served as a Company director since 2018 and was Chair of the Audit Committee up until April 3, 2023. According to the 2023 Proxy Statement, as of January 23, 2023, Defendant Catz beneficially owned 8,459 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant Catz owned approximately $894,032 worth of Disney stock.

45.     For the 2022 Fiscal Year, Defendant Catz received $439,143 in total compensation from the Company. This included $152,486 in fees earned or paid in cash, $236,657 in stock awards, and $50,000 in all other compensation. For the 2021 Fiscal Year, Defendant Catz received $389,822 in total compensation from the Company. This included $150,000 in fees earned or paid in cash, $189,607 in stock awards, and $50,215 in all other compensation.

46.     The 2023 Proxy Statement stated the following about Defendant Catz:

**Notable Experience Aligned with Disney's Strategy and Key Board Contributions**
- Through Ms. Catz's position as Chief Executive Officer and formerly Chief Financial Officer of Oracle Corporation, she provides invaluable insight to both the leadership team and fellow Board members on long-term strategic planning and execution and large-scale cost rationalization and organizational structure evaluation[.]
- Ms. Catz oversaw the successful acquisition and integration of companies at Oracle, a key skill set to contribute to the Board throughout Disney's prior acquisition strategies and future development[.]

- Ms. Catz's executive leadership roles at Oracle also allow her to offer impactful guidance to the Board and leadership team on the rapidly changing technological landscape that affects our businesses[.]
- Her experience leading the financial function of a complex, global technology company strengthens her role on the Audit Committee through the extensive financial and accounting and risk management expertise she brings to the Board and committee[.]

**Other Key Skill Sets**
- Cybersecurity oversight, including the protection of electronically stored data from her executive roles at Oracle[.]
- Brand management and governance thought leadership developed through the oversight of the strategic direction of Oracle[.]

### Defendant Chang

47.     Defendant Chang has served as a Company director since May 27, 2021. She is also a member of the Governance and Nominating Committee. According to the 2023 Proxy Statement, as of January 23, 2023, Defendant Chang beneficially owned 120 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant Chang owned approximately $12,683 worth of Disney stock.

48.     For the 2022 Fiscal Year, Defendant Chang received $403,177 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $236,657 in stock awards, and $41,520 in all other compensation. For the 2021 Fiscal Year, Defendant Chang received $122,685 in total compensation from the Company. This included $43,269 in fees earned or paid in cash, $64,416 in stock awards, and $15,000 in all other compensation.

49.     The 2023 Proxy Statement stated the following about Defendant Chang:

**Notable Experience Aligned with Disney's Strategy and Key Board Contributions**
- Ms. Chang has developed expertise across the technology sector from her time as an Executive Vice President at Cisco Systems, Inc., leading product development for Google Ads Measurement and Reporting and a founder of a digital startup[.]

- She provides a unique viewpoint of emerging technology trends and the implementation of innovative technological business strategies that are particularly important to our Media and Entertainment Distribution business[.]
- Ms. Chang also provides valuable perspective on talent attraction and retention for key technical roles that are vital to Disney's content creation and digitally driven teams and an understanding of large-scale cost rationalization and analysis of organizational structure from her tenure as a public company director and an executive at Google and Cisco[.]

**Other Key Skill Sets**
- Risk management oversight experience specific to digital and technology-forward companies, including cybersecurity, gained through her tenure at Cisco[.]
- Deep understanding of strategic planning, corporate governance, social initiatives and executive management succession planning gained through public company board leadership[.]

### **Defendant deSouza**

50.     Defendant deSouza has served as a Company director since 2018. He also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of January 23, 2023, Defendant deSouza beneficially owned 4,835 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant deSouza owned approximately $511,011 worth of Disney stock.

51.     For the 2022 Fiscal Year, Defendant deSouza received $366,953 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $236,657 in stock awards, and $5,296 in all other compensation. For the 2021 Fiscal Year, Defendant deSouza received $324,607 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $189,607 in stock awards, and $10,000 in all other compensation.

52.     The 2023 Proxy Statement stated the following about Defendant deSouza:

**Notable Experience Aligned with Disney's Strategy and Key Board Contributions**

Verified Shareholder Derivative Complaint

- Through his experience as Chief Executive Officer of Illumina, Inc. and prior senior leadership roles at Symantec Corporation and other technology companies, Mr. deSouza provides a deep understanding of executive management and international business operations, in addition to a strong knowledge of brand management and product development [.]
- Mr. deSouza has unique experience with the growth and maturation of technology businesses, providing insight to the Board and leadership team on the risks and opportunities involved in the development of diverse and changing businesses and the technological developments that affect our business [.]
- • Through first-hand experience, he brings deep knowledge of overseeing business operations while incorporating public health considerations, which has served as an invaluable perspective as the Company navigates the continued challenges coming out of the COVID-19 pandemic [.]

**Other Key Skill Sets**
- Cybersecurity expertise through experience at Symantec [.]
- Knowledge of finance and accounting gained through experience in Chief Executive Officer and other leadership positions[.]
- Oversight of strategic integration and experience with consumer awareness of corporate social responsibility practices through his leadership of and commitment to Illumina's corporate social responsibility program[.]

**<u>Defendant Froman</u>**

53.     Defendant Froman has served as a Company director since 2018. He also serves as a member of the Governance and Nominating Committee. According to the 2023 Proxy Statement, as of January 23, 2023, Defendant Froman beneficially owned 6,220 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant Froman owned approximately $657,392 worth of Disney stock.

54.     For the 2022 Fiscal Year, Defendant Froman received $433,625 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $236,657 in stock awards, and $71,968 in all other compensation. For the 2021 Fiscal Year, Defendant Froman received $383,942 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $189,607 in stock awards, and $69,335

in all other compensation.

55.     The 2023 Proxy Statement stated the following about Defendant Froman:

**Notable Experience Aligned with Disney's Strategy and Key Board Contributions**
- Mr. Froman delivers strategic insight to the Board and leadership team on complex international affairs gained from his experience as the Assistant to the President and Deputy National Security Advisor for International Economic Policy, and as the United States Trade Representative[.]
- His roles overseeing strategic growth and leveraging technology to expand digital inclusion at Mastercard and as a Distinguished Fellow on the Council of Foreign Relations enable him to offer guidance to the Company on international markets in which we participate, factors affecting international trade and the balance of risks and opportunities in a dynamic marketplace, including digital governance issues and cybersecurity risks[.]
- Mr. Froman's perspective is particularly impactful given our strategic focus on innovation in changing markets and the global growth of our customer base[.]

**Other Key Skill Sets**
- International trade, finance, executive and brand management and risk management gained through executive leadership roles at Citigroup[.]
- Meaningful experience with alternative investments business and environmental and social policy implementation [.]

**<u>Defendant Iger</u>**

56.     Defendant Iger has served as the Company's CEO since November 2022. Prior to this, he served as the Company's CEO from 2005 to 2020. Additionally, he served as Chairman of the Board and Executive Chairman from 2020 to 2021. According to the 2023 Proxy Statement, as of January 23, 2023, Defendant Iger beneficially owned 186,874 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant Iger owned approximately $19.8 million worth of Disney stock.

57.     For the 2022 Fiscal Year, Defendant Iger received $14,998,299 in total compensation from the Company. This included $1,096,154 in salary, $4,670,521 in stock awards, $2,395,104 in option awards, $4,370,000    in      non-equity      incentive      plan

compensation, and $2,466,520 in all other compensation. For the 2021 Fiscal Year, Defendant Iger received $45,899,796 in total compensation from the Company. This included $3,000,000 in salary, $9,479,879 in stock awards, $9,293,921 in option awards, $22,920,000 in non-equity incentive plan compensation, and $1,205,996 in all other compensation.

58.    The 2023 Proxy Statement stated the following about Defendant Iger:

**Notable Experience Aligned with Disney's Strategy and Key Board Contributions**

- Gained through his experience serving as Chief Executive Officer of Disney for 15 years, Mr. Iger has an unmatched knowledge of the Company and the creative content it produces, and an in-depth understanding of fostering innovation through technology and connecting to audiences in our markets around the world[.]
- Throughout Mr. Iger's tenure at Disney, he successfully expanded the Company's geographic presence, identified new revenue streams and initiated the Company's DTC efforts, expanding the scale and global reach of Disney's storytelling and streaming services[.]
- Mr. Iger has also furthered Disney's rich history of storytelling through the successful landmark acquisitions and integration of Pixar, Marvel, Lucasfilm and 21st Century Fox[.]
- Mr. Iger carried the same level of dedication into his role as Executive Chairman, where he oversaw Disney's creative endeavors, providing audiences with engaging stories and compelling characters, and as a consultant to the Board and leadership team throughout 2022[.]
- His detailed understanding of all facets of the Company, prior experience leading Disney through various market conditions and implementing successful strategic shifts throughout his career have uniquely positioned Mr. Iger to serve as Chief Executive Officer of Disney and a member of the Board of Directors at this time[.]

**Other Key Skill Sets**

- Knowledge of finance and accounting and operational expertise gained through experience in Chief Executive Officer and other leadership positions[.]
- Deep understanding of risk management and corporate governance and social initiatives gained through his public company board experience[.]

**Defendant Lagomasino**

59.     Defendant Lagomasino has served as a Company director since 2015. She is also a member of the Governance and Nominating Committee and Chair of the Compensation Committee. According to the 2023 Proxy Statement, as of January 23, 2023, Defendant Lagomasino beneficially owned 2,815 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant Lagomasino owned approximately $297,517 worth of Disney stock.

60.     For the 2022 Fiscal Year, Defendant Lagomasino received $396,730 in total compensation from the Company. This included $159,973 in fees earned or paid in cash, $236,657 in stock awards, and $100 in all other compensation. For the 2021 Fiscal Year, Defendant Lagomasino received $354,855 in total compensation from the Company. This included $155,000 in fees earned or paid in cash, $189,607 in stock awards, and $10,248 in all other compensation.

61.     The 2023 Proxy Statement stated the following about Defendant Lagomasino:

**Notable Experience Aligned with Disney's Strategy and Key Board Contributions**

- As the founder of the Institute for the Fiduciary Standard and advisory board member of the Millstein Center for Global Markets and Corporate Ownership, Ms. Lagomasino is an expert in the field of governance and social thought leadership[.]

- As an executive leader in private banking industries and as a member of the Council on Foreign Relations, she has deep wealth management, investment and fiduciary expertise and extensive experience in leading complex organizations and evaluating businesses in a variety of industries with varying size and complexities[.]

- She brings meaningful experience in executive compensation-related matters from her role as Chair of the Company's Compensation Committee, where she focuses on overseeing the alignment of incentive structures with shareholder value creation and execution of long-term strategic priorities[.]

- Significant knowledge of global brands, business development, executive management succession planning and risk management through experience on public company boards[.]

**Other Key Skill Sets**
- Extensive experience across domestic and international finance, investment and capital markets through her roles at WE Family Offices and JP Morgan[.]

### Defendant McDonald

62.     Defendant McDonald has served as a Company director since May 2021. He is also a member of the Compensation Committee. According to the 2023 Proxy Statement, as of January 23, 2023, Defendant McDonald beneficially owned 451 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant McDonald owned approximately $47,666 worth of Disney stock.

63.     For the 2022 Fiscal Year, Defendant McDonald received $361,657 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $236,657 in stock awards. For the 2021 Fiscal Year, Defendant McDonald received $107,685 in total compensation from the Company. This included $43,269 in fees earned or paid in cash and $64,416 in stock awards.

64.     The 2023 Proxy Statement stated the following about Defendant McDonald:

**Notable Experience Aligned with Disney's Strategy and Key Board Contributions**
- Mr. McDonald has over 25 years of retail and brand building experience, bringing powerful insight to the Board on integrating customer experience across multiple channels[.]
- As Chief Executive Officer of lululemon athletica, he has led the company in innovating integrated guest experiences and offers valuable perspective on the growth, development and guest innovation of an international consumer business that is particularly relevant to Disney's leadership team[.]
- Mr. McDonald is responsible for the growth, development and consumer product operations of lululemon athletica, including overseeing the

company's incorporation and expansion of a DTC offering and creative product design, providing him a fundamental understanding of consumer strategies that support and accelerate customer engagement[.]

**Other Key Skill Sets**
- Deep understanding of management, leadership and executive management from his experience at lululemon athletica[.]
- Strong knowledge of finance and accounting, risk management and corporate governance and social initiatives gained through his role as a public company chief executive officer[.]

**Defendant Parker**

65.   Defendant Parker has served as a Company director since 2016. He also serves as Chair of the Executive Committee, Chair of the Governance and Nominating Committee, and as a member of the Compensation Committee. According to the 2023 Proxy Statement, as of January 23, 2023, Defendant Parker beneficially owned 129 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant Parker owned approximately $13,634 worth of Disney stock.

66.   For the 2022 Fiscal Year, Defendant Parker received $361,657 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $236,657 in stock awards. For the 2021 Fiscal Year, Defendant Parker received $314,607 in total compensation from the Company. This included $125,000 in fees earned or paid in cash and $189,607 in stock awards.

67.   The 2023 Proxy Statement stated the following about Defendant Parker:

**Notable Experience Aligned with Disney's Strategy and Key Board Contributions**
- As the former President and Chief Executive Officer of NIKE, Mr. Parker has overseen and managed the growth of a complex, global organization, and has experience exercising cost discipline and oversight of organizational structure, as well as executive management succession planning, bringing a valuable perspective to fellow directors and the broader leadership team[.]

- Through this experience, Mr. Parker brings first-hand knowledge of workforce and human capital management including managing creative talent and compensation, a critical skill set for Disney's Board given our continued focus on human capital management oversight[.]
- Mr. Parker offers a unique insight to the Company regarding the design, production, marketing and distribution of consumer products and managing a major international consumer brand through various market evolutions over a more than 40-year time period[.]

**Other Key Skill Sets**

- Financial and executive management and risk management background gained through roles as President and Chief Executive Officer, as well as Executive Chairman of NIKE[.]
- Experience in integrating environmental and social practices into corporate strategy through his leadership at NIKE as the company integrated sustainable innovation into product development and manufacturing[.]

**<u>Defendant Rice</u>**

68.     Defendant Rice has served as a Company director since 2019. He also serves as Chair of the Audit Committee. According to the 2023 Proxy Statement, as of January 23, 2023, Defendant Rice beneficially owned 1 share of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on January 23, 2023 was $105.69, Defendant Rice owned approximately $105.69 worth of Disney stock.

69.     For the 2022 Fiscal Year, Defendant Rice received $431,657 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $236,657 in stock awards, and $70,000 in all other compensation. For the 2021 Fiscal Year, Defendant Rice received $364,683 in total compensation from the Company. This included $125,027 in fees earned or paid in cash, $189,607 in stock awards, and $50,049 in all other compensation.

70.     The 2023 Proxy Statement stated the following about Defendant Rice:

**Notable Experience Aligned with Disney's Strategy and Key Board Contributions**

- Mr. Rice offers deep experience on the alignment of financial and strategic objectives and an understanding of cost discipline and effective organizational structure, a primary focus of the Company's Board and management team particularly throughout Disney's strategic evolution, through his experience in key financial and operational roles at global companies, including as Chief Financial Officer of Eli Lilly for more than a decade[.]
- His strong knowledge of large brand-focused organizations gained through experience leading the pharmacy benefits management business of CVS Health and as Chief Financial Officer of Eli Lilly has been a valuable addition to the Board[.]
- Mr. Rice provides expertise in financial oversight and accounting through his financial executive experience, as well his experience as an audit committee member of public companies, enhancing Disney's Audit Committee oversight of risks that may arise out of financial planning and reporting, internal controls and information technology[.]

**Other Key Skill Sets**

- Strong understanding of broader risk management oversight and complex, global business operations through senior operation roles at CVS and Eli Lilly[.]
- Deep understanding of strategic planning, corporate governance and social initiatives through service on other public company boards[.]

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

71.    By reason of their positions as officers, directors, and/or fiduciaries of Disney and because of their ability to control the business and corporate affairs of Disney, the Individual Defendants owed Disney and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Disney in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Disney and its shareholders so as to benefit all shareholders equally.

72.    Each director and officer of the Company owes to Disney and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair

dealing.

73.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Disney, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

74.     To discharge their duties, the officers, and directors of Disney were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

75.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Disney, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

76.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its

regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

77.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Disney were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Disney's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Disney conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Disney and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Disney's operations would comply with all applicable laws and Disney's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be

accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

78.     Each of the Individual Defendants further owed to Disney and the shareholders the duty of loyalty requiring that each favor Disney's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

79.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Disney and were at all times acting within the course and scope of such agency.

80.     Because of their advisory, executive, managerial, directorial, and controlling positions with Disney, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

81.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Disney.

## DISNEY'S CODE OF ETHICS AND CORPORATE GOVERNANCE

### *Disney's Code of Business and Ethics for Directors*

82.     Disney's Code of Business and Ethics for Directors (the "Disney Code")

applies to all Disney directors. The "Introductory Statement" to the Disney Code opens with the following:

> The Walt Disney Company is committed to conducting business in accordance with the highest standards of business ethics and complying with applicable laws, rules and regulations. **In furtherance of this commitment, the Board of Directors (the "Board") promotes ethical behavior, and has adopted this Code of Business Conduct and Ethics for Directors ("Code").**
>
> Every Director must:
> (i)  **represent the interests of the shareholders of The Walt Disney Company**;
> (ii)  exhibit high standards of integrity, commitment and independence of thought and judgment;
> (iii)  dedicate sufficient time, energy and attention to ensure the diligent performance of his or her duties;
> (iv)  and comply with every provision of this Code.

(Emphasis added.)

83.    Under the heading "Conflicts of Interest," the Disney Code states: "Directors must avoid conflicts of interest…Directors should also be mindful of, and seek to avoid, conduct which could reasonably be construed as creating an appearance of a conflict of interest."

84.    In the section titled "Use of Corporate Information, Opportunities and Assets," the Disney Code further states that directors "may not…use opportunities that are discovered through the use of Company property, Company information or position, for their personal benefit or the benefit of persons or entities outside the Company." Directors are also prohibited from "improperly us[ing] or wast[ing] any Company asset."

85.    The Disney Code makes it clear under the "Compliance with Laws, Rules and Regulations" section that directors are required to maintain "strict compliance" with "applicable laws, rules and regulations." The Disney Code further specifies that the laws directors are required to comply with include "federal and other securities laws, including insider trading laws, and the Company's insider trading compliance policies."

86.     Additionally, in a section tiled "Accountability," the Disney Code provides:

The Code referred to herein is mandatory and applies to all Directors, who are accountable for compliance with the Code.

Directors should communicate any suspected violations of this Code promptly to the Chairman of the Governance and Nominating Committee and the Chairman of the Board. Suspected violations will be investigated by or at the direction of the Board or the Governance and Nominating Committee, and appropriate action will be taken in the event that a violation is confirmed.

87.     While the Disney Code does allow directors to waive provisions of the Disney Code, directors may only do so with the permission of either the Board or the Governance and Nominating Committee. Any waiver "must be promptly disclosed to the Company's shareholders as required by applicable law or securities exchange regulations."

### *Disney's Standards of Business Conduct*

88.     The Company also maintains "The Walt Disney Company and Affiliated Companies Standards of Business Conduct" (the "Disney Standards"). Under the section titled "Speak Up," the Disney Standards state:

**The Guideline**
is a resource for employees and Cast Members to 1) report questionable activities – including questionable accounting or auditing matters; 2) report complaints regarding the Company's accounting, internal accounting controls or auditing matters; 3) ask for guidance on any business conduct-related issue; or 4) make the Company aware of any suspected unethical or illegal conduct, or violation of our Standards of Business Conduct or of any other Company policies.

89.     The "Integrity: Our Standards" section of the Disney Standards emphasizes the Company's commitment to "do what's right and take responsibility for [its] actions to protect [its] guests, [its] audiences, [its] consumers and [its] shareholders." Regarding the purpose of the Disney Standards, they state, in relevant part:

**Why We Have Standards of Business Conduct**

…We recognize that our continued success depends upon a commitment to conduct business with honesty, integrity and in compliance with the law everywhere we operate.

If you are a supervisor, you have a greater level of responsibility. We look to you to model ethical behavior and promote a workplace where Cast Members and employees feel comfortable coming forward with concerns and questions…

90.     In the "Honesty: Our Commitment to the Company and Our Shareholders" section of the Disney Standards, the Company represents that "[p]rotecting [Disney's] reputation requires a commitment to truth and high standards in everything [the Company] do[es]." On a similar note, regarding "Conflicts of Interest," the Disney Standards state the following:

**Conflicts of Interest**
Our business is built on public trust and confidence and an expectation by guests and customers that they can depend on our products and services. To deliver our very best, each of us has an obligation to make objective decisions on behalf of the Company and avoid situations where a conflict (or apparent conflict) exists between the Company's interests and our own, personal interests.

91.     The "Honesty: Our Commitment to the Company and Our Shareholders" section of the Disney Standards also emphasizes the important of accurate financial reporting by stating:

**Accurate Recordkeeping and Financial Reporting and Complaints Regarding Accounting and Auditing Matters**
Accurate and complete recordkeeping is essential to the successful operation of our Company, as well as to our ability to meet our legal and regulatory obligations. You have a responsibility to be accurate, complete and honest in what you report and record to meet regulatory requirements, as well as in all Company documents…

92.     In the "Play by the Rules" section of the Disney Standards, the Company states that it is "committed to comply[ing] with the law everywhere in the world [the Company] operates[.]" Further, this section of the Disney Standards, in part, states:

**Inside Information and Securities Trading**

As a Cast Member or employee, your job may expose you to material, nonpublic (or "inside") information about our Company or companies with which we do business. Material inside information is information about a company that is not available to the public but, if it were, might influence someone's investment decision about that company. Examples of material inside information include: information about mergers or acquisitions, financial performance, changes in executive management, significant transactions or new projects contemplated.

You may not trade in Company stock or other securities based on material inside information you have about our Company, and you may not trade in the stock of companies we work with if your job exposes you to inside information about those companies. Passing along a "tip" is also a form of insider trading and strictly prohibited. Keep in mind, even the appearance of an improper transaction must be avoided.

***Disney's Corporate Governance Guidelines***

93.    The Company also maintains Corporate Governance Guidelines (the "Disney Guidelines"), the first section of which is entitled "Composition of the Board of Directors." Under this section, the Company, in part, states:

It is the policy of the Board that the Board at all times reflect the following characteristics.

**Each Director shall at all times represent the interests of the shareholders of the Company.**

Each Director shall at all times exhibit high standards of integrity, commitment and independence of thought and judgment.

(Emphasis added)

94.    Under the "Board Conduct and Review" section, the Disney Guidelines, in relevant part, state:

**Members of the Board shall act at all times in accordance with the requirements of the Company's Code of Business Conduct and Ethics for Directors.** This obligation shall at all times include, without limitation, strict adherence to the Company's policies with respect to conflicts of interest, confidentiality, protection of the Company's assets, ethical conduct in all

business dealings and respect for and compliance with applicable law. Any waiver of the requirements of the Code of Business Conduct and Ethics for Directors with respect to any individual Director shall be reported to, and be subject to the approval of, the Board.

The Board shall conduct an annual review and evaluation of its conduct and performance based upon participation by all Directors in an evaluation that includes, among other things, an assessment of:

a. the Board's composition and independence;

b. the Board's access to and review of information from management, and the quality of such information;

c. the Board's responsiveness to shareholder concerns;

d. **maintenance and implementation of the Company's standards of conduct; and**

e. maintenance and implementation of these Guidelines.

### *Disney's Audit Committee Charter*

95.     Disney's Audit Committee Charter opens with the reaffirmation of the responsibilities of the Board of Directors, which the Company states "include oversight of the Company's systems of internal control, preparation and presentation of financial reports and compliance with applicable laws, regulations and Company policies." The Audit Committee Charter provides the responsibilities delegated to the Audit Committee to assure the Board fulfills "its duties to the Company and its shareholders" and further stipulates that the "Committee shall be given the resources and assistance necessary to discharge its responsibilities, including appropriate funding" and "unrestricted access to Company personnel and documents and the Company's independent auditors."

96.     The Audit Committee Charter states that the purpose of the Audit Committee "is to assist the Board in its oversight of" the following:

- the integrity of the Company's financial statements;
- the adequacy of the Company's system of internal controls;
- the Company's compliance with legal and regulatory requirements;
- the qualifications and independence of the Company's independent auditors;

Verified Shareholder Derivative Complaint

- the performance of the Company's independent auditors and of the Company's internal audit functions…; and
- to prepare an audit committee report as required by the Securities and Exchange Commission…to be included in the Company's annual proxy statement.

97.     The Audit Committee Charter further states that the Audit Committee shall take the following actions, among others, with respect to the Company's financial reporting processes:

- review the accounting and reporting treatment of significant transactions outside the Company's ordinary operations;
- review with management and the Company's independent auditors significant changes to the Company's accounting principles or their application as reflected in the financial reports;
- ***review draft quarterly and annual financial statements and discuss their appropriateness with management and the Company's independent auditors***, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the matters required to be discussed by the applicable requirements of the PCAOB and the SEC

(Emphasis added.)

98.     Disney's Audit Committee Charter also states that the Audit Committee shall have responsibility for overseeing management's implementation of an effective system of internal controls that "helps promote the reliability of financial and operating information and compliance with applicable laws, regulations and Company policies, including those related to risk management, ethics and conflicts of interest." The Audit Committee is to take the following actions with respect to the Company's internal control processes:

- inquire of management, management auditors and the Company's independent auditors concerning any deficiencies in the Company's policies and procedures that could adversely affect the adequacy of internal controls and the financial reporting process and review any special audit steps adopted in light of any material control deficiencies and the timeliness and reasonableness of proposed corrective actions;
- review significant management audit findings and recommendations, and

- review the Company's policies and practices with respect to risk assessment and risk management:
- review the Company's policies and practices related to compliance with laws, ethical conduct and conflicts of interest…

99.    The Audit Committee Charter also requires the Audit Committee to establish procedures for the receipt of complaints. The Audit Committee is required to receive, retain, and treat the complaints received by the Company "regarding accounting, internal accounting controls and auditing matters." Any complaints received are required to stay "confidential" and "anonymous."

100.    Finally, Disney's Audit Committee Charter requires that the Audit Committee "conduct an annual evaluation of its performance in carrying out its responsibilities."

101.    In violation of the Disney Code, the Disney Standards, the Disney Guidelines, and the Audit Committee Charter, the Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also, in violation of Disney's corporate governance documents, the Defendants failed to maintain the accuracy of Disney's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Disney Code.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

### *The Walt Disney Company*

102.    Founded in 1923 by brothers Walt and Roy Disney, The Walt Disney Company is the world's largest entertainment group. The Company has grown from exclusively releasing cartoons based on various of its characters, like the Company's iconic Mickey Mouse, to—either on its own or through its subsidiaries—engaging in film and

episodic television content production and distribution; operating television networks, including, but not limited to, ESPN, ABC Television Network, History, Freeform, and National Geographic; and running studios that produce films under various banners, including Disney, Walt Disney Animation Studios, Pixar Animation Studios, Lucasfilm, Marvel Studios, Searchlight Pictures, and 20th Century Studios.

103.   Additionally, the Company sells and licenses film and television content to third-party television and subscription video-on-demand services; operates theatrical, home entertainment, and music distribution services; stages and licenses live entertainment events; and offers post-production services.

104.   In recent years, the Company has begun offering DTC streaming services to its customers through platforms such as Disney+, Disney+ Hotstar, ESPN+, Hulu, and Star+.

### *Defendant Chapek Replaces Robert Iger as CEO of the Company*

105.   In February 2020, Disney announced that Defendant Iger was stepping down as the Company's CEO after serving in the role for over 15 years. The Company revealed that Defendant Chapek, who had worked under Defendant Iger at Disney for more than a decade, would replace Defendant Iger as the Company's CEO. Defendant Iger was to remain at Disney through the end of his contract on December 31, 2021, assuming the role of the Company's new Executive Chairman. In addition, he was assigned to oversee Disney's creative endeavors and lead the Board.

106.   Defendant Chapek was reportedly chosen by Defendant Iger to be his successor. At the time, Defendant Iger stated the following:

> With the successful launch of Disney's direct-to-consumer businesses and the integration of Twenty-First Century Fox well underway, I believe this is the optimal time to transition to a new CEO…I have the utmost confidence in Bob and look forward to working closely with him over the next 22 months as he assumes this new role and delves deeper into Disney's multifaceted global business and operations, while I continue to focus on the Company's creative endeavors.

***COVID-19's Impact on Disney***

107.   In March 2020, just one month after Defendant Chapek became the Company's CEO, the World Health Organization declared the COVID-19 coronavirus a pandemic. The pandemic and related lockdowns and restrictions forced Disney to close its theme parks, resorts, and cruise lines. In addition, the Company significantly reduced its movie distribution, its most profitable distribution channel, to the point of nearly eliminating it.

108.   COVID-19 significantly impacted the Company's financials, forcing Disney to announce the suspension of its dividend in May 2020. In addition, the Company reported its first quarterly loss in 19 years in August 2020, and its first annual loss in more than 40 years in November 2020.

***Disney+***

109.   Disney+ is the Company's subscription streaming service that was first launched in November 2019 under Defendant Iger's tenure as CEO. During the COVID-19 pandemic, while most of Disney's businesses suffered losses, Disney+ thrived.

110.   Although Disney had originally set an initial target of 60-90 million subscribers by the end of the 2024 fiscal year, Disney+ managed to gain over 50 million subscribers in its first five months online under Defendant Chapek's leadership. By November 2020, Disney+ had nearly 74 million subscribers. In other words, Disney+ quickly became the singular success amidst an otherwise challenging start that Defendant Chapek faced in his new role as Disney's CEO.

***Defendant Chapek Reorganizes the Company***

111.   In October 2020, the Company made an announcement to the public revealing a major reorganization of Disney's media and entertainment operations. This reorganization marked a dramatic departure from Disney's historical reporting structure and sparked considerable controversy internally. Previously, the Company was organized into four reporting segments: (1) Media Networks; (2) Parks, Experiences and Products;

(3) Studio Entertainment; and (4) Direct-to-Consumer & International. The new structure, which synthesized the Company into only two reporting segments, took power away from creative content-focused executives and centralized it in a new reporting group. Under Defendant Chapek's direction and leadership, the Company was split into two reporting segments: (1) DMED; and (2) Disney Parks, Experiences and Products ("DPEP"). The DMED segment encompassed Disney+ and was led by Defendant Daniel, who reported directly to Defendant Chapek.

112.    Because Disney+ was Disney's only segment showing promise in the wake of COVID-19, Defendant Chapek insisted that the Company prioritize its DTC streaming strategy. As a result, Disney was reportedly reorganized as a way to accelerate the Company's strategy for DTC, based largely on the success Disney+ was experiencing. Defendant Chapek affirmed this decision in an interview on *CNBC* where he noted that the reorganization of the Company was intended to:

> *[A]ccelerate our transition to a real direct-to-consumer priority company*…We believe that we've got the opportunity to build upon the success of Disney+, which by almost any measure has been far and above anybody's expectations and really use this to catalyze our growth and increase shareholder wealth.

(Emphasis added.)

113.    In a press release issued by the Company, the restructuring was again described as being driven by the success of Disney+. In relevant part, the press release stated:

> *In light of the tremendous success achieved to date in the Company's direct-to-consumer business and to further accelerate its DTC strategy, The Walt Disney Company today announced a strategic reorganization of its media and entertainment businesses.* Under the new structure, Disney's world-class creative engines will focus on developing and producing original content for the Company's streaming services, as well as for legacy platforms, while distribution and commercialization activities will be centralized into a single, global Media and Entertainment Distribution organization. The new Media and Entertainment Distribution group will be responsible for all monetization

of content – both distribution and ad sales – and will oversee operations of the Company's streaming services. It will also have sole P&L accountability for Disney's media and entertainment businesses.

(Emphasis added.)

114. As a result of the Company's reorganization, DMED became the singular reporting segment through which all the distribution and commercialization activities of the Company's media and entertainment operations were centralized and reported. DMED's operating results were in turn reported across three distribution lines of business: (1) Direct-to Consumer (i.e., streaming); (2) Linear Networks (i.e., cable and broadcast television networks); and (3) Content Sales/Licensing (i.e., theatrical, home entertainment, and third-party television and subscription video-on-demand ("TV/SVOD") distribution globally). Under this structure, ***DMED was exclusively responsible for the monetization of all of Disney's content globally***, including both distribution and advertising sales. DMED also oversaw the operations of the Company's streaming services, including Disney+. In addition, through the reorganization, Chapek transferred budgetary and distribution control from the heads of Disney's content groups to DMED's new Chairman, Defendant Daniel. Daniel, who had a longstanding mentorship with Chapek, now directly reported to him.

115. When Defendant Chapek spoke on the Company's push into streaming and the DTC model, he stated "[t]here is a seismic shift happening in the marketplace, and you can either lead or follow and we chose to lead." He further stated that the Company's focus was now on "what platform is best to meet those consumer needs." More specifically, in regard to Disney+'s role in these changes and the newly created DMED, Defendant Chapek stated:

> Given the incredible success of Disney+ and our plans to accelerate our direct-to-consumer business, we are strategically positioning our Company to more effectively support our growth strategy and increase shareholder value… ***Managing content creation distinct from distribution will allow us to be more effective and nimbler in making the content consumers want most, delivered in the way they prefer to consume it***. Our creative teams will

concentrate on what they do best – making world-class franchise-based content – while ***our newly centralized global distribution team will focus on delivering and monetizing that content in the most optimal way across all platforms***, including Disney+, Hulu, ESPN+ and the coming Star International streaming service.

(Emphasis added)

### Defendants' Fraudulent Scheme

116. Throughout the Relevant Period, the Individual Defendants repeatedly misrepresented the true state of Disney+, its subscriber growth, and its overall profitability to the investing public. Their objective was to mask the weight of losses incurred by Disney+ and create a false appearance of sustainable subscriber growth and attainable targets for fiscal year 2024. To achieve this, the Individual Defendants utilized the newly formed DMED to inappropriately transfer costs away from the Disney+ platform and onto legacy platforms.

117. At the same time, Defendants concealed from investors that Disney+'s original booming subscriber numbers were not sustainable, as they had been temporarily boosted by Disney+'s cheap $6.99 launch price and the fact that consumers were still homebound as a result of COVID-19 and, as such, consuming more content. As a result, those most likely to subscribe to Disney+ had already done so by the beginning of the Relevant Period, making the Company's optimistic projections for Disney+'s fiscal year 2024 subscriber growth widely unattainable.

118. Under the guidance of Defendants Chapek and Daniel, and with Defendant McCarthy's knowledge, DMED debuted content originally intended for Disney+ on legacy platforms, like Disney Channel, thereby shifting the marketing and production costs of that content to those legacy platforms and away from Disney+. This, in turn, decreased the overall costs associated with Disney+.

119. Throughout the Relevant Period, the Individual Defendants repeatedly represented to investors that DMED's platform distribution decisions were based on factors

like customer preferences and what was commercially best for Disney's business, thereby concealing the true motive behind the cost-shifting scheme.

**False and Misleading Statements**

***December 10, 2020 Investor Day Presentation***

120.    On December 10, 2020, the start of the Relevant Period, Disney broadcasted the Company's 2020 Investor Day presentation, providing investors with updates regarding Disney's present businesses, reorganization, and plans, including plans related to Disney's DTC strategies. During the presentation, Defendants Chapek, Daniel, Iger, and McCarthy delivered prepared remarks, and Defendants Chapek and McCarthy additionally answered questions from analysts.

121.    Defendant Chapek began the presentation by emphasizing Disney+'s subscriber numbers, stating the following, in relevant part:

> It's hard to believe it's only been a year since we first introduced you and the world to a whole new way of enjoying the magic of Disney in the comfort and convenience of your own homes. We knew this one-of-a-kind service featuring content only Disney can create would resonate with consumers and stand out in the marketplace. And needless to say, Disney+ has exceeded our wildest expectations, with 86.8 million subscribers as of December 2nd. That's quite an achievement! This success has bolstered our confidence in our continued acceleration towards a DTC-first business model, and more importantly, it's launched The Walt Disney Company into a new era of delivering consumers truly exceptional entertainment built around our world-renowned brands and franchises.

122.    Defendant Chapek later described how Disney's new DMED team would distribute Disney's content, alleging that decisions regarding platform distribution would be based on what was most beneficial to consumers. In relevant part, Defendant Chapek stated:

> Since the launch of Disney+, we have been working hard to meet the growing demand for our entertainment. And now, with our recent reorganization, we've separated content creation from distribution, and ***put in place a new structure that will allow us to be even more nimble, responsive and effective in the delivery of our unparalleled programming***. This will enable us to tell

great stories, inspired by the perfect mix of creative excellence enhanced by data-driven audience insights, delivered in ways that consumers want.

Our unique access to an incredible number of consumer touch points across our businesses gives us a clear advantage. Based on insights gained from this wealth of data, our distribution and commercialization team is able to better inform our creatives of consumer preferences. And the creative teams are empowered to make the high-quality branded entertainment they believe will resonate with audiences. ***This new organization also gives us maximum flexibility in determining when - and on which platform - content will be available.*** And this is especially important now given consumers' rapidly changing consumption behaviors, and the prolonged uncertainty due to the pandemic.

***As circumstances change, we will continue to consider these and other critical factors when determining what steps we may take to most effectively distribute our programming***. Our goal is always to serve consumers in the best way possible.

(Emphasis added.)

123.   Next, Defendant Daniel spoke, re-affirming that the DMED team and the Company would make content distribution decisions based on what was most beneficial to consumers. He stated:

[C]onsumer behavior really does drive our decision-making. While we have always valued the data gained through our numerous consumer touchpoints, the rapid growth of our portfolio of DTC services provides us with an even greater opportunity to understand their preferences, and we are using these insights to help determine how to optimally engage with our audiences.

***In fact, our team uses all of the information available to us when determining how best to allocate our annual creative content budgets across platforms, with the goal to maximize both audience engagement and commercial impact.***

And we share this budgetary framework and critical insights with our creative partners, as part of a truly collaborative planning process that delivers high-quality, branded entertainment, to achieve our established growth objectives for all of our platforms: from direct-to-consumer to linear networks, to theatrical exhibition.

(Emphasis added.)

124.   Defendant Daniel also emphasized the Company's dedication to consumer preferences, stating:

> [T]he wealth of Disney+ content that we'll preview for you today also reflects a mix of stories developed specifically for the service, along with content originally intended for theatrical release. In particular, ***a number of Disney and Pixar films heading to Disney+ were previously planned as theatrical releases - but as a perfect illustration of our strategic pivot to a DTC-first business model, we have decided they will now be Disney+ originals***…. It is important to note that all of these distribution plans reflect our current view of the media and entertainment landscape. One of the primary benefits of our new organizational structure is our ability to quickly re-evaluate and adjust our plans in light of any changes in the marketplace. ***And we will continue to shift and optimize our mix of windowed theatrical, day-and-date, and DTC exclusive offerings according to what is best for the consumer and our businesses.***

(Emphasis added.)

125.   Defendant Iger re-affirmed the Company's commitment to consumer experience, stating in part:

> When I became CEO 15 years ago, I envisioned a world where distribution, powered by transformative technology, would expand dramatically - almost to the point of becoming a commodity. If we could harness that technology and couple it with our extraordinary content, we would be well-positioned to not only withstand disruption, but to thrive in a new, increasingly dynamic environment… Fast-forward, and in just a year, we've established ourselves as one of the true leaders in the direct-to-consumer space. ***And what you'll see today reflects an increased commitment to focus the resources and immense creativity across our Company on delivering an extraordinary direct-to-consumer experience unlike anything else that's in the market.*** You're about to hear from our amazing executives and get a preview of what they've been hard at work creating for Hulu, Star, and Disney+. We love what we are seeing, and we're confident audiences around the world will, too.

(Emphasis added.)

126.   Later, Defendant McCarthy provided estimates for Disney+'s subscriber and

profitability numbers, stating:

> If you recall, last year, we said that we expected Disney+ to have between 60 and 90 million subscribers by the end of fiscal 2024. But as you know, ***our subscriber growth to-date is well ahead of our original expectations - and we have an incredible and growing slate of high-quality content that will capture a broader global audience*** and further fuel Disney+, making it, what we believe, is an even more compelling product…
>
> ***We now expect that by the end of fiscal 2024, we will have between 230 and 260 million total paid Disney+ subscribers globally***, compared to the 60 to 90 million we shared last year. I'll note that our prior outlook did not anticipate the launch of Disney+ Hotstar, which we now expect could be between 30 and 40 percent of our subscriber base by the end of fiscal 2024…
>
> Given the value of growing our subscriber base, as you've seen today, we plan to reinvest revenue generated from our better-than-expected subscriber growth back into content investment. ***Thus, we continue to expect Disney+ to achieve profitability in fiscal 2024.*** Again, I'll note that this guidance includes Disney+, Star, Star+ and Disney+ Hotstar.

(Emphasis added)

127.  During the 2020 Investor Day presentation, the Company showcased presentation slides containing estimates for subscriber and profitability numbers by the end of fiscal year 2024. The Company asserted that by the end of fiscal year 2024, Disney+ would achieve profitability and attract a paid global subscriber base ranging from 230 to 260 million, with 30% to 40% of those subscribers coming from Disney+ Hotstar.

128.  During the Q&A session at the 2020 Investor Day presentation, Defendant Chapek was prompted to elaborate on the decision-making process behind Disney's content distribution, including the criteria for selecting platforms and the Company's approach to catering to consumer preferences as demonstrated in the presentation. Defendant Chapek's response, in relevant part, was:

> So to me, it's really about over - of the 100 titles that we announced today, 80% of them are going first to Disney+, which I think says something about our pivot over to Disney+. But at the same time, we had $13 billion of box

office last year. And that's obviously not something to sneeze at. And we know as The Walt Disney Company who've got this plethora of franchises that we just showed you today, that we build those franchises through the theatrical exhibition window and we did $13 billion back in '19. So for us, it's about balance. And it's about following the consumer as they make that transition. ***And so part of why we did the reorganization that we did is to ensure that we've got an organization that's flexible to read all the cues, whether it's the cessation of COVID or it's changing consumer behavior so that we can very nimbly make decisions as we go forward.*** And that 80% direct-to-consumer is not just Disney+, obviously, but that includes Hulu and Star as well.

(Emphasis added.)

129.  The statements referenced in ¶¶121-128 above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (2) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (3) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (4) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

130.  Based on the representations made by the Company and Defendants Chapek, McCarthy, Daniel, and Iger during the 2020 Investor Day presentation, multiple analyst reports repeated the remarkable claims regarding the rapid growth and profitability of

Disney+. Several reports suggested that Disney+ might eventually outpace Netflix to become the most extensively embraced paid streaming service globally, with *Variety* reporting that "Disney is moving in on Netflix fast, and if the streaming giant doesn't build up a stronger strategy, it could lose its top spot in the streaming wars."[3] By the end of December 2020, Disney common stock was trading at all-time highs of over $180 per share.

### January 19, 2021 Proxy Statement

131.   On January 19, 2021, the Company filed its Schedule 14A with the SEC (the "2021 Proxy Statement"). Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Iger, Lagomasino, Parker, and Rice solicited the 2021 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

132.   The 2021 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Iger, Lagomasino, Parker, and Rice to the Board; (2) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm of the Company for the 2021 Fiscal Year; and (3) approve, on an advisory basis, the Company's executive compensation.

133.   Regarding "The Board's Role in Risk Oversight," the 2021 Proxy Statement stated the following, in relevant part:

> As noted in the Company's Corporate Governance Guidelines, the Board, acting directly or through committees, is responsible for "assessing major risk factors relating to the Company and its performance" and "reviewing measures to address and mitigate such risks." In discharging this responsibility, the Board, either directly or through committees, assesses both (a) *risks that relate to the key economic and market assumptions that inform the Company's business plans (including significant transactions) and growth strategies*, and (b) significant operational risks related to the conduct of the Company's day-to-day operations.
>
> Risks relating to the market and economic assumptions that inform the Company's business plans and growth strategies are specifically addressed with respect to each business unit in connection with the Board's review of the Company's long-range plan. The Board also has the opportunity to address

[3] https://variety.com/vip/disney-investor-day-review-top-10-takeaways-1234851438/

such risks at each Board meeting in connection with its regular review of significant business and financial developments. The Board reviews risks arising out of specific significant transactions when these transactions are presented to the Board for review or approval.

***Significant operational risks that relate to on-going business operations are the subject of regularly scheduled reports to either the full Board or one of its committees.*** The Board acting through the Audit Committee reviews as appropriate whether these reports cover the significant risks that the Company may then be facing.

***Each of the Board's committees addresses risks that fall within the committee's areas of responsibility.*** For example, the Audit Committee periodically reviews the audit plan of the internal audit department, the international labor standards compliance program, the tax function, treasury operations, insurance and the Company's standards of business conduct compliance program. In addition, the Audit Committee receives regular reports from: corporate controllership and the outside auditor on financial reporting matters; the internal audit department about significant findings; and the General Counsel regarding legal and regulatory risks.

(Emphasis added.)

134.   With respect to the Company's Standards of Business Conduct, the 2021 Proxy Statement stated that "[t]he Company has *Standards of Business Conduct*, which are applicable to all employees of the Company, including the principal executive officer [and]the principal financial officer…" It further stated that "[t]he Board has a separate *Code of Business Conduct and Ethics for Directors*, which contains provisions specifically applicable to Directors."

135.   The 2021 Proxy Statement also noted that "[i]f the Company amends or waives the *Code of Business Conduct and Ethics for Directors* or the *Standards of Business Conduct* with respect to the principal executive officer, principal financial officer or principal accounting officer, it will post the amendment or waiver at the same location on its website."

136.   The 2021 Proxy Statement was materially false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Disney Standards and the Disney Code, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2021 Proxy Statement's descriptions of the Board's and its committees' risk

oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

137.   The 2021 Proxy Statement was also materially false and misleading because it failed to disclose, *inter alia*, that: (1) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (2) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (3) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (4) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

138.   As a result of Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Iger, Lagomasino, Parker, and Rice causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Iger, Lagomasino, Parker, and Rice to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

### *February 11, 2021 Earnings Call*

139.   On February 11, 2021, the Company held its earnings call for the first quarter of 2021. During the call, Defendant Chapek again boasted that "Disney+ [had] exceeded even [the Company's] highest expectations in just over a year since its launch with 94.9 million subscribers as of the end of the first fiscal quarter."

140.   During the same call, an analyst from The Goldman Sachs Group, Inc. ("Goldman Sachs") asked if the Company needed to revisit its projected profitability regarding Disney+, to which Defendant McCarthy re-affirmed that Disney+ would reach profitability by the end of the 2024 fiscal year. She stated, in relevant part:

> *We said at our Investor Day, which wasn't too long ago, that we expected to reach profitability in fiscal 2024. We're not going to change that at this point*, although we are very pleased with the results that we just announced. But we are also -- given the value of growing our sub base, we are continuing to invest in high-quality content. We believe that content is the single biggest driver to not only acquiring subs, but retaining them.
>
> We're also going to have some other cost drivers that we just have to factor into our timing for profitability, and that includes marketing, technology, customer service and just other expenses of running a new business. *So we're sticking to that 2024 - fiscal 2024 profitability.* But once again, we're very pleased with where we are today.

(Emphasis added)

141.   The statements referenced in ¶¶139-140 above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (2) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (3) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (4) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and

(5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### May 13, 2021 Earnings Call

142.    On May 13, 2021, the Company hosted an earnings call to discuss its financial results for the second fiscal quarter of 2021. During the call, Defendant Chapek repeated that Disney+ would reach the 2024 paid global subscriber estimates that Defendants had previously touted during the 2020 Investor Day Presentation. He stated:

> We are uniquely positioned with the most compelling brands and franchises in entertainment, and we continue to deliver the high-quality, one-of-a-kind content that consumers want. That's clearly reflected in the success of Disney+, which amassed nearly 104 million paid subscribers as of the end of the second fiscal quarter. ***We are on track to achieve our guidance of 230 to 260 million subscribers by the end of fiscal 2024.***

(Emphasis added)

143.    Defendant McCarthy, during the same call, also stated that "[Disney] remain[s] right on track to reach [its] fiscal 2024 guidance of 230 to 260 million subs, powered by the addition of 30 million paid Disney+ subs in the first half of the year."

144.    The statements referenced in ¶¶142-143 above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (2) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (3) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer

behavior, or the goal of maximizing the content's audience; (4) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### **The Truth Begins to Emerge as the False and Misleading Statements Continue**
#### *September 21, 2021 Virtual Presentation*

145. On September 21, 2021, Goldman Sachs hosted its Communacopia Conference, where the Company and Defendant Chapek gave a virtual presentation about Disney+. Defendant Chapek noted during the presentation that *the rate of subscriber growth for Disney+ had slowed*, particularly during the fourth quarter of the 2021 Fiscal Year. Defendant Chapek stated, "[i]n Q4, I think what you can expect to see is that our global paid subs will increase by low single-digit millions of subscribers versus Q3."

146. Still Defendant Chapek re-affirmed the Company's 2024 goals for Disney+ subscriptions, stating, "[w]e're very confident about our long-term sub growth as we have been."

147. Upon hearing the news, *CNBC* issued a report which reflected Disney's disappointing figures and failure to meet market expectations. Prior to the close of market on September 21, 2022, *CNBC* reported, in relevant part:

> Disney expects to add "low single-digit millions" of streaming subscribers in the fourth quarter, Chapek said. Disney shares ended the session down 4.1% after Chapek's comments at the virtual Goldman Sachs Communacopia Conference.

> Chapek said "mobilizing partners" in Latin America to push Disney's new Star+ streaming service, the Covid-related suspension of the India Premier League – whose games air on Disney's Hotstar – and production delays from the delta variant have all hurt subscriber numbers in the fourth quarter.

"We are going to see a little bit more noise than maybe the Street projects quarter to quarter," Chapek said. "The resurgence of Covid and delta did impact some of our productions."

***Chapek's forecast is significantly lower than some analyst estimates.*** Deutsche Bank analyst Bryan Kraft had projected Disney+ net adds of about 13 million in the quarter.

Global production delays will be "very short term," Chapek said. But he acknowledged there won't be as much new programming in the fourth quarter "than we might have expected," which will affect subscriber growth.

Disney has projected 230 million to 260 million Disney+ subscribers by 2024. Disney said in August it had 116 million Disney+ subscribers.

Chapek cautioned investors that quarter-to-quarter growth "is not linear" and some choppiness is expected. Still, he remained confident in Disney's long-term growth outlook.

(Emphasis added.)

148.   On this news, the price per share of Disney's common stock dropped $7.44 per share, or 4%, from closing at $178.61 per share on September 20, 2021, to close on September 21, 2021 at $171.17 per share.

149.   Despite this drop, the Defendants failed to disclose the full truth about Disney+ to investors, instead re-affirming the 2024 projections for subscriber numbers and profitability, and thereby causing Disney's common stock to remain artificially inflated.

### *November 10, 2021 Press Release and Form 8-K*

150.   On November 10, 2021 after the market closed, the Company issued a press release, which it also filed with the SEC as an exhibit to a Form 8-K. The press release reported on both fourth quarter and fiscal year ended October 2, 2021 financial results. In the press release, the Company reported the smallest quarterly gain of subscribers to Disney+ since its launch, at only 2.1 million subscribers for the quarter, well beneath Wall Street's already diminished expectations for the Company's growth. Further, the Company reported revenue of $18.53 billion, and adjusted earnings per share of 37 cents. Notably,

all three of these figures were below the consensus estimates compiled by Bloomberg of: 119.6 million subscribers, $18.78 billion in revenues, and adjusted earnings per share of 49 cents.

151.    On this news, the Company stock price fell $12.34, or 7%, from a closing price of $174.45 per share on November 10, 2021 to close at $162.11 per share on November 11, 2021. Despite these revelations, the price of Disney common stock remained artificially inflated because Defendants failed to disclose the full truth about Disney+ to investors.

***November 10, 2021 Earnings Call***

152.    On November 10, 2021, after the market closed, the Company hosted an earnings call to discuss its financial results for the fourth quarter and fiscal year ended October 2, 2021. On the call, Defendant Chapek again represented to investors that the Company was on track to reach its previously stated goals of 230-260 million paid global Disney+ subscribers by the end of fiscal 2024, stating as follows, in relevant part:

> I want to reiterate that we remain focused on managing our DTC business for the long term, not quarter-to-quarter, and we're confident we are on the right trajectory to achieve the guidance that we provided at last year's Investor Day, reaching between 230 million and 260 million paid Disney+ subscribers globally by the end of fiscal year 2024, and with Disney+ achieving profitability that same year.

153.    Defendant McCarthy also confirmed that the Company had the ability to reach its 2024 projections, stating, in relevant part:

> [W]e are increasing our overall long-term content expense for Disney+, and we are well positioned to achieve the subscriber target of 230 million to 260 million by fiscal 2024 that we laid out at last year's Investor's Day. And we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024.

154.    The statements referenced in ¶152-153 above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements

failed to disclose that: (1) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (2) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (3) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (4) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### January 19, 2022 Proxy Statement

155.   On January 19, 2022, the Company filed the 2022 Proxy Statement with the SEC. Defendants Chapek, Arnold, Barra, Catz, Chang, deSouza, Froman, Lagomasino, McDonald, Parker, and Rice solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

156.   The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Chapek, Arnold, Barra, Catz, Chang, deSouza, Froman, Lagomasino, McDonald, Parker, and Rice to the Board; (2) ratify the appointment of PricewaterhouseCoopers LLP as the independent registered public accounting firm of the Company for the 2022 Fiscal Year; and (3) approve, on an advisory basis, the Company's executive compensation.

157.   Regarding the "Board's Role in Risk Oversight," the 2022 Proxy Statement stated the following, in relevant part:

As noted in the Company's Corporate Governance Guidelines, the ***Board, acting directly or through committees, is responsible for "assessing major***

***risk factors relating to the Company and its performance" and "reviewing measures to address and mitigate such risks."*** In discharging this responsibility, the Board, either directly or through committees, assesses both (a) risks that relate to the key economic and market assumptions that inform the Company's business plans (including significant transactions) and growth strategies, and (b) significant operational risks related to the conduct of the Company's day-to-day operations.

***Risks relating to the market and economic assumptions that inform the Company's business plans and growth strategies are specifically addressed with respect to each business unit in connection with the Board's review of the Company's long-range plan.*** The Board also has the opportunity to address such risks at each Board meeting in connection with its regular review of significant business and financial developments. The Board reviews risks arising out of specific significant transactions when these transactions are presented to the Board for review or approval.

Significant operational risks that relate to on-going business operations are the subject of regularly scheduled reports to either the full Board or one of its committees. The Board acting through the Audit Committee reviews as appropriate whether these reports cover the significant risks that the Company may then be facing.

***Each of the Board's committees addresses risks that fall within the committee's areas of responsibility.*** For example, the Audit Committee periodically reviews the audit plan of the internal audit department, the international labor standards compliance program, the tax function, treasury operations, insurance and the Company's standards of business conduct compliance program. In addition, the Audit Committee receives regular reports from: corporate controllership and the outside auditor on financial reporting matters; the internal audit department about significant findings; and the General Counsel regarding legal and regulatory risks…

The Audit Committee reserves time at each meeting for private sessions with the Chief Financial Officer, General Counsel, head of the internal audit department and outside auditors. The Compensation Committee addresses risks arising out of the Company's executive compensation programs as described at page 29. The operational risks periodically reviewed by committees are also reviewed by the entire Board when a committee or the Board determines this is appropriate.

The independent Lead Director promotes effective communication and consideration of matters presenting significant risks to the Company through her role in developing the Board's meeting agendas, advising committee chairs, chairing meetings of the independent Directors and facilitating communications between independent Directors and the Chief Executive Officer.

(Emphasis added.)

158.   With respect to the Disney Standards, the 2022 Proxy Statement stated that the Company "has Standards of Business Conduct, which are applicable to all employees

of the Company, including the principal executive officer [and] the principal financial officer…" It further stated that "[t]he Board has a separate Code of Business Conduct and Ethics for Directors, which contains provisions specifically applicable to Directors."

159.   The 2022 Proxy Statement was materially false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Disney Standards and the Disney Code, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

160.   The 2022 Proxy Statement was also materially false and misleading because it failed to disclose, *inter alia*, that: (1) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (2) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (3) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (4) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

161.   As a result of Defendants Chapek, Arnold, Barra, Catz, Chang, deSouza, Froman, Lagomasino, McDonald, Parker, and Rice causing the 2022 Proxy Statement to

be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Chapek, Arnold, Barra, Catz, Chang, deSouza, Froman, Lagomasino, McDonald, Parker, and Rice to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

### August 10, 2022 Press Release and Earnings Call

162.    On August 10, 2022, the Company issued a press release, which it also filed with the SEC as an exhibit to a Form 8-K. In the press release, the Company provided results for its third fiscal quarter ended on July 2, 2022.

163.    The same day, the Company held an earnings call to discuss its third quarter financial results. During the call, Defendant McCarthy revised down the Company's 2024 Disney+ guidance by just 15 million on both the low and high ends, which still remained significantly higher than the platform's actual performance. Additionally, she reaffirmed Disney+'s 2024 profitability estimate, stating the following:

> … I want to spend some time sharing a few updates on our fiscal 2024 guidance for Disney+. We are providing more detail on subscriber targets by separating our guidance into 2 categories: core Disney+ and Disney+ Hotstar. Excluding the impact of any significant future macro headwinds, our core Disney+ subscriber target range is 135 million to 165 million by the end of fiscal 2024, largely consistent with previously provided guidance that non-Hotstar Disney+ subscribers in 2024 would approximate 60% to 70% of the expected 230 million to 260 million total subscriber base.
>
> ***We are, however, updating subscriber guidance for Disney+ Hotstar to up to 80 million subscribers by the end of fiscal 2024.*** We intend to refine this target over time as subscriber visibility in India will be clearer once the ICC and BCCI cricket rights sales processes are completed. As you may know, we recently made the disciplined decision to not proceed with the Indian Premier League digital rights, and we'll evaluate these rights with that same discipline.
>
> ***As we sit here today, we remain confident that Disney+ will achieve profitability in fiscal 2024*** and look forward to several upcoming catalysts, including reaching a steady state of tentpole original content releases, delivery of premium general entertainment and international local originals and the

1
2
upcoming launch of our ad-supported tier, alongside the new pricing structure announced earlier today.

3
(Emphasis added)

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
164.    The statements referenced in ¶163 above were materially false and misleading when made because they failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (2) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (3) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (4) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

20
### **The Truth Fully Emerges**

21
### *November 8, 2022 Press Release*

22
23
24
25
26
27
165.    On November 8, 2022, the truth came to light when the Company issued a press release disclosing its financial results for the fourth quarter and fiscal year ended October 1, 2022. The press release revealed that Disney's DTC segment, comprising streaming services Disney+, ESPN+, Hulu, and Hotstar, incurred a substantial operating loss of $1.47 billion, a significant increase from the $630 million loss reported in the same quarter the previous year. The revenue in the DTC segment showed a modest 8% growth,

28

reaching $4.9 billion.

166.   Furthermore, the Company reported a decline in its average revenue per Disney+ subscriber, mainly due to more customers opting for discounted bundles with the Company's other services. The bundled offerings accounted for about 40% of domestic subscribers, confirming that ***Disney had been relying on short-term promotional efforts to boost subscriber growth, potentially hampering the platform's long-term profitability***.

167.   In addition to the challenges faced by the DTC segment, the overall revenue for the quarter grew by only 9% to $20.15 billion, falling short of the market's expectations of $21.36 billion. Similarly, the Company's quarterly sales of $20.2 billion missed analysts' projections by approximately $1 billion, and earnings, excluding certain items, dropped to 30 cents per share, falling below the average estimate of 51 cents per share from analysts surveyed by Bloomberg.

168.   On this news, the Company's stock price fell $13.15, or 13%, from a closing price of $99.90 per share on November 8, 2022, to close at $86.75 per share on November 9, 2022.

## Aftermath of the Truth Emerging

169.   On November 20, 2022, less than two weeks after the November 8, 2022 press release, Disney announced it had terminated Defendant Chapek's employment at the Company, only five months after the Board had voted to extend Chapek's employment contract. The Company also announced that it would be replacing Defendant Chapek with Defendant Iger as the Company's CEO. Within one day of this announcement, Defendant Daniel was also terminated from his position at Disney on November 21, 2022.

170.   On November 21, 2022, *The Wall Street Journal* reported on both internal disputes at Disney and issues that led to Defendant Chapek's termination. According to *The Wall Street Journal*, Defendant Chapek's role as CEO had "been shaky for months." Furthermore, the report included information concerning the cost-shifting scheme the Defendants engaged in and continuously concealed from investors throughout the Relevant

Period. Notably, the report disclosed how the Defendants had shifted certain expenses that should have been attributed to Disney+ to other areas within the DMED segment to make Disney+ seem closer to profitability than it actually was. *The Wall Street Journal* reported that Defendant McCarthy had specifically expressed her concerns about the Company's propriety in relation to Disney+ internally. In relevant part, the report stated:

> ***Disney is moving some shows that were supposed to be Disney+ originals and air them first on other networks*** including the Disney Channel, people familiar with the matter said.
>
> ***By doing so, the costs of production and marketing of the shows*** – which included mystery show "*The Mysterious Benedict Society*" and medical drama "*Doogie Kameāloha, M.D.*" – ***would be shifted away from the streaming service, making its financial performance look better***, they said.
>
> ***Ms. McCarthy was concerned about this strategy***, the people said.

(Emphasis added.)

171.   On February 8, 2023, Disney released its financial results for the first quarter of fiscal year 2023, covering the period ending December 31, 2022. The report disclosed that Disney+ experienced a decline of 2.4 million subscribers, while the the Company's DTC segment witnessed an increase in operating loss from $0.5 billion to $1.1 billion. This escalation in losses was attributed, in part, to higher programming and production costs incurred by Disney+.

172.   That same day, on a conference call, Defendant Iger, now CEO of the Company, announced a broad restructuring of the Company aimed at putting the Company's streaming business on a path to both profitability and growth, stating, in relevant part, as follows:

> In 2019, Disney+ launched, with nearly 500 films and 7,500 episodes of television from across the world of Disney. Three years later, its meteoric rise is considered one of the most successful results in the history of the media business.
>
> Now it's time for another transformation, one that rationalizes our enviable

streaming business and puts it on a path to sustained growth and profitability while also reducing expenses to improve margins and returns and better positioning us to weather future disruption, increased competition and global economic challenges. We must also return creativity to the center of the company, increase accountability, improve results and ensure the quality of our content and experiences.

173.   Defendant Iger emphasized that, to restore Disney's success, it was crucial that power be returned to Disney's creative executives. He thereby announced another restructuring of the Company's core business segments. Specifically, distribution decisions would be back under the control of Disney's creative executives in contrast to the choice Defendant Chapek had made to shift those decisions away from Disney's creative executives and towards DMED. Regarding the role of the Company's creative executives, Defendant Iger stated:

Our company is fueled by storytelling and creativity. And virtually every dollar we earn, every transaction, every interaction with our consumers emanates from something creative. I've always believed that the best way to spur great creativity is to make sure that people who are managing the creative process feel empowered.

Therefore, our new structure is aimed at returning greater authority to our creative leaders and making them accountable for how their content performs financially. Our former structure severed that link, and it must be restored. Moving forward, our creative teams will determine what content we're making, how it is distributed and monetized and how it gets marketed.

174.   Defendant Iger then discussed the details of how he planned correct Disney's path to success. He described the Company's newly-introduced three core business segments, which were designed to allow creative executives to maximize revenue and growth, stating the following:

Managing costs, maximizing revenue and driving growth from the content being produced will be their responsibility. Under our strategic reorganization, there will be 3 core business segments: Disney Entertainment, ESPN and Disney Parks, Experiences and Products.

Alan Bergman and Dana Walden will be Co-Chairman of Disney

Entertainment, which will include the company's full portfolio of entertainment, media and content businesses globally, including streaming. Jimmy Pitaro will continue to serve as Chairman of ESPN, which will include ESPN Networks, ESPN+ and our international sports channels. And Josh D'Amaro will continue to be Chairman of Disney Parks, Experiences and Products, which will include our theme parks, resort destinations and cruise line as well as Disney's consumer products, games and publishing businesses.

These organizational changes will be implemented immediately, and we will begin reporting under the new business structure by the end of the fiscal year. This reorganization will result in a more cost- effective, coordinated and streamlined approach to our operations. And we are committed to running our businesses more efficiently, especially in a challenging economic environment.

175.   Regarding Disney+, Defendant Iger stated that Disney would not be providing long-term subscriber guidance for Disney+ moving forward. He stated in part:

Like many of our peers, *we will no longer be providing longterm subscriber guidance in order to move beyond an emphasis on short-term quarterly metrics*, although we will provide color on relevant drivers. Instead, our priority is the enduring growth and profitability of our streaming business.

(Emphasis added.)

176.   Finally, Defendant Iger announced that the Company would be cutting $5.5 billion in costs with $2.5 billion in non-content cuts, including 7,000 jobs, and $3 billion in content savings over the next few years to rein in costs. He stated, in relevant part:

In that regard, we are targeting $5.5 billion of cost savings across the company. First, reductions to our non-content costs will total roughly $2.5 billion, not adjusted for inflation. $1 billion in savings is already underway, and Christine will provide more details. But in general, the savings will come from reductions in SG&A and other operating costs across the company.

To help achieve this, we will be reducing our workforce by approximately 7,000 jobs. While this is necessary to address the challenges we're facing today, I do not make this decision lightly. I have enormous respect and appreciation for the talent and dedication of our employees worldwide, and I'm mindful of the personal impact of these changes.

On the content side, we expect to deliver approximately $3 billion in savings over the next few years, excluding sports. Christine will be providing more details during the call. Turning to our streaming businesses. I'm proud of what we've been able to achieve since the launch of Disney+ just 3 years ago. We are delivering more content with greater quality in more ways, in more places and to larger audiences.

177.   On May 10, 2023, Disney released its financial results for the second quarter of fiscal year 2023, which concluded on April 1, 2023. The Company disclosed that Disney+ experienced a decline in subscribers for the second consecutive quarter, confirming that the previously projected 2024 Disney+ targets were unattainable. During this quarter, Disney+ lost 4 million paid subscribers compared to the previous quarter, surprising analysts who had anticipated a growth of 1.7 million subscribers. Despite the setbacks in Disney+, the streaming revenue still saw a 12% increase from the same period in the previous year, partly attributed to recent price increases that were necessary due to the significant losses incurred by the streaming service.

178.   On May 10, 2023, in a conference call held by the Company to discuss its financial results, Defendant Iger reiterated the need for Disney's streaming business to restructure its business model to attain profitability. He emphasized the importance of rationalizing the volume of content being produced and the associated production costs. Additionally, he announced the Company's intention to implement another price increase, particularly for the Disney+ ad-free tier, which posed a potential risk of further subscriber losses.

179.   On this news the Company's stock price fell $8.83, or 8%, from a closing of $101.14 per share on November 10, 2021, to close at $92.31 per share on May 11, 2023.

### Repurchases During the Relevant Period

180.   During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $78.7 million to repurchase approximately 557,313 shares of its own common stock at artificially inflated prices from

December 2020 through November 2022.

181.   According to the Form 10-Q the Company filed with the SEC on February 11, 2021 for the quarterly period ended January 2, 2021 (the "1Q 2021 10-Q"), between December 1, 2020 and January 2, 2021, the Company purchased 18,664 shares of its common stock for approximately $3,181,092 at an average price of $170.44 per share.[4]

182.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,561,990 for repurchases of its own stock between December 1, 2020 and January 2, 2021.

183.   According to the Form 10-Q the Company filed with the SEC on May 13, 2021 for the quarterly period ended April 3, 2021 (the "2Q 2021 10-Q"), between January 3, 2021 and January 31, 2021, the Company purchased 18,215 shares of its common stock for approximately $3,156,842 at an average price of $173.31 per share.

184.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,576,690 for repurchases of its own stock between January 3, 2021 and January 31, 2021.

185.   According to the 2Q 2021 10-Q, between February 1, 2021 and February 28, 2021, the Company purchased 18,230 shares of its common stock for approximately $3,342,653 at an average price of $183.36 per share.

186.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,761,200 for repurchases of its own stock between February 1, 2021 and February 28, 2021.

187.   According to the 2Q 2021 10-Q, between March 1, 2021 and April 3, 2021, the Company purchased 18,820 shares of its common stock for approximately $3,638,282 at an average price of $193.32 per share.

188.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $2,005,647 for

---

[4] Upon information and belief, these shares were repurchased during the Relevant Period.

Verified Shareholder Derivative Complaint

repurchases of its own stock between March 1, 2021 and April 3, 2021.

189.   According to the Form 10-Q the Company filed with the SEC on August 12, 2021 for the quarterly period ended July 3, 2021 (the "3Q 2021 10-Q"), between April 4, 2021 and April 30, 2021, the Company purchased 17,873 shares of its common stock for approximately $3,346,898 at an average price of $187.26 per share.

190.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,796,415 for repurchases of its own stock between April 4, 2021 and April 30, 2021.

191.   According to the 3Q 2021 10-Q, between May 1, 2021 and May 31, 2021, the Company purchased 19,292 shares of its common stock for approximately $3,336,166 at an average price of $172.93 per share.

192.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,662,585  for repurchases of its own stock between May 1, 2021 and May 31, 2021.

193.   According to the 3Q 2021 10-Q, between June 1, 2021 and July 3, 2021, the Company purchased 19,511 shares of its common stock for approximately $3,432,180 at an average price of $175.91 per share.

194.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,739,601 for repurchases of its own stock between June 1, 2021 and July 3, 2021.

195.   According to the Form 10-K the Company filed with the SEC on November 24, 2021 for the fiscal year ended October 2, 2021 (the "2021 10-K"), between July 4, 2021 and July 31, 2021, the Company purchased 15,923 shares of its common stock for approximately $2,872,350 at an average price of $180.39 per share.

196.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,491,030  for repurchases of its own stock between July 4, 2021 and July 31, 2021.

197.   According to the 2021 10-K, between August 1, 2021 and August 31, 2021, the Company purchased 15,510 shares of its common stock for approximately $2,743,719 at an average price of $176.90 per share.

198.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,398,227 for repurchases of its own stock between August 1, 2021 and August 31, 2021.

199.   According to the 2021 10-K, between September 1, 2021 and October 2, 2021, the Company purchased 15,493 shares of its common stock for approximately $2,781,303 at an average price of $179.52 per share.

200.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,437,286 for repurchases of its own stock between September 1, 2021 and October 2, 2021.

201.   According to the Form 10-Q the Company filed with the SEC on February 9, 2022 for the quarterly period ended January 1, 2022 (the "1Q 2022 10-Q"), between October 3, 2021 and October 31, 2021, the Company purchased 16,599 shares of its common stock for approximately $2,842,413 at an average price of $171.24 per share.

202.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,402,450  for repurchases of its own stock between October 3, 2021 and October 31, 2021.

203.   According to the 1Q 2022 10-Q , between November 1, 2021 and November 30, 2021, the Company purchased 23,036 shares of its common stock for approximately $3,625,406 at an average price of $157.38 per share.

204.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,627,033 for repurchases of its own stock between November 1, 2021 and November 30, 2021.

205.   According to the 1Q 2022 10-Q, between December 1, 2021 and January 1, 2022, the Company purchased 28,624 shares of its common stock for approximately

$4,226,047 at an average price of $147.64 per share.

206. As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,742,915 for repurchases of its own stock between December 1, 2021 and January 1, 2022.

207. According to the Form 10-Q the Company filed with the SEC on May 11, 2022 for the quarterly period ended April 2, 2022 (the "2Q 2022 10-Q"), between January 2, 2022 and January 31, 2022, the Company purchased 25,595 shares of its common stock for approximately $3,649,847 at an average price of $142.60 per share.

208. As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,429,481 for repurchases of its own stock between January 2, 2022 and January 31, 2022.

209. According to the 2Q 2022 10-Q, between February 1, 2022 and February 28, 2022, the Company purchased 20,873 shares of its common stock for approximately $3,136,377 at an average price of $150.26 per share.

210. As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $1,325,644 for repurchases of its own stock between February 1, 2022 and February 28, 2022.

211. According to the 2Q 2022 10-Q, between March 1, 2022 and April 2, 2022, the Company purchased 24,942 shares of its common stock for approximately $4,211,207 at an average price of $168.84 per share.

212. As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $2,047,489 for repurchases of its own stock between March 1, 2022 and April 2, 2022.

213. According to the Form 10-Q the Company filed with the SEC on August 10, 2022 for the quarterly period ended July 2, 2022 (the "3Q 2022 10-Q"), between April 3, 2022 and April 30, 2022, the Company purchased 23,363 shares of its common stock for approximately $2,943,271 at an average price of $125.98 per share.

214.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $916,530 for repurchases of its own stock between April 3, 2022 and April 30, 2022.

215.   According to the 3Q 2022 10-Q, between May 1, 2022 and May 31, 2022, the Company purchased 42,751 shares of its common stock for approximately $4,531,178 at an average price of $105.99 per share.

216.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $822,529 for repurchases of its own stock between May 1, 2022 and May 31, 2022.

217.   According to the 3Q 2022 10-Q, between June 1, 2022 and July 2, 2022, the Company purchased 36,469 shares of its common stock for approximately $3,540,775 at an average price of $97.09 per share.

218.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $377,089 for repurchases of its own stock between June 1, 2022 and July 2, 2022.

219.   According to the Form 10-K the Company filed with the SEC on November 29, 2022 for the fiscal year ended October 1, 2022 (the "2022 10-K"), between July 3, 2022 and July 31, 2022, the Company purchased 30,343 shares of its common stock for approximately $3,058,878 at an average price of $100.81 per share.

220.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $426,623 for repurchases of its own stock between July 3, 2022 and July 31, 2022.

221.   According to the 2022 10-K, between August 1, 2022 and August 31, 2022, the Company purchased 22,440 shares of its common stock for approximately $2,692,576 at an average price of $119.99 per share.

222.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $745,906 for

repurchases of its own stock between August 1, 2022 and August 31, 2022.

223.   According to the 2022 10-K, between September 1, 2022 and October 1, 2022, the Company purchased 23,058 shares of its common stock for approximately $2,475,968 at an average price of $107.38 per share.

224.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $475,687 for repurchases of its own stock between September 1, 2022 and October 1, 2022.

225.   According to the Form 10-Q the Company filed with the SEC on February 8, 2023 for the quarterly period ended December 31, 2022 (the "1Q 2023 10-Q"), between October 2, 2022 and October 31, 2022, the Company purchased 25,673 shares of its common stock for approximately $2,563,449 at an average price of $99.85 per share.

226.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $336,316 for repurchases of its own stock between October 2, 2022 and October 31, 2022.

227.   According to the 1Q 2023 10-Q, between November 1, 2022 and November 30, 2022, the Company purchased 36,016 shares of its common stock for approximately $3,385,864 at an average price of $94.01 per share.[5]

228.   As the Company's stock was actually worth only $86.75 per share, the price at closing on November 9, 2022, the Company overpaid by approximately $261,476 for repurchases of its own stock between November 1, 2022 and November 30, 2022.

229.   Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $30.3 million.

## DAMAGES TO DISNEY

230.   As a direct and proximate result of the Individual Defendants' conduct, Disney has lost and will continue to lose and expend many millions of dollars.

231.   Such losses include over $30.3 million the Company overpaid when it

---

[5] Upon information and belief, these shares were repurchased during the Relevant Period.

repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

232. Such expenditures also include, but are not limited to, fees associated with the Securities Class Action filed against the Company and Defendants Chapek, McCarthy, and Daniel, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

233. Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

234. As a direct and proximate result of the Individual Defendants' conduct, Disney has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

235. Plaintiff brings this action derivatively and for the benefit of Disney to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Disney, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a), 10(b), and 20(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Chapek, McCarthy, and Daniel.

236. Disney is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

237. Plaintiff is, and has been at all relevant times, a shareholder of Disney. Plaintiff will adequately and fairly represent the interests of Disney in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

1

## DEMAND FUTILITY ALLEGATIONS

238.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

239.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Disney's Board consisted of Defendants Barra, Catz, Chang, deSouza, Froman, Iger, Lagomasino, McDonald, Parker, and Rice (the "Director-Defendants") along with nonparty Carolyn Everson (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven Directors that were on the Board at the time this action was filed.

240.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by over $30.3 million for repurchases of its own stock, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

241.   Moreover, Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Iger, Lagomasino, Parker, and Rice, solicited the 2021 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to Disney.

242.   Similarly, Defendants Chapek, Arnold, Barra, Catz, Chang, deSouza, Froman, Lagomasino, McDonald, Parker, and Rice, solicited the 2022 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to Disney.

243.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Disney to issue materially false and

misleading statements. Specifically, the Director-Defendants caused Disney to issue false and misleading statements which were intended to make Disney appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

244. Additional reasons that demand on Defendant Barra is futile follow. Defendant Barra has served as a Company director since 2017. She also serves as a member of the Compensation Committee. Defendant Barra has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Barra solicited both the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, inter alia, to shareholders reelecting her to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Barra breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

245. Additional reasons that demand on Defendant Catz is futile follow. Defendant Catz has served as a Company director since 2018. She also serves as a member of the Audit Committee. Defendant Catz has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Catz solicited both the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, inter alia, to shareholders reelecting her to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her

duties to protect corporate assets. For these reasons, Defendant Catz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

246. Additional reasons that demand on Defendant Chang is futile follow. Defendant Chang has served as a Company director since May 2021. She also serves as a member of the Governance and Nominating Committee. Defendant Chang has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Chang solicited the 2022 Proxy Statement, which contained false and misleading elements that contributed, inter alia, to shareholders reelecting her to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Chang breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

247. Additional reasons that demand on Defendant deSouza is futile follow. Defendant deSouza has served as a Company director since 2018. He also serves as a member of the Audit Committee. Defendant deSouza has received and continues to receive compensation for his role as a director as described above. In addition, Defendant deSouza solicited both the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, inter alia, to shareholders reelecting him to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant deSouza breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

248. Additional reasons that demand on Defendant Froman is futile follow. Defendant Froman has served as a Company director since 2018. He also serves as a member of the Governance and Nominating Committee. Defendant Froman has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Froman solicited both the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, inter alia, to shareholders reelecting him to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Froman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

249. Additional reasons that demand on Defendant Iger is futile follow. Defendant Iger is currently the Company's CEO and one of its directors. As such, the Company provides Defendant Iger with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As a director during the Relevant Period, Defendant Iger was ultimately aware of or should have been aware of all of the false and misleading statements and omissions that were made by or on behalf of the Company. In addition, he solicited the 2021 Proxy Statement which contained false and misleading elements. As the Company's previous highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons Defendant Iger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

250.   Additional reasons that demand on Defendant Lagomasino is futile follow. Defendant Lagomasino has served as a Company director since 2015. She also serves as a member of the Governance and Nominating Committee and is the Chair of the Compensation Committee. Defendant Lagomasino has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Lagomasino solicited both the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, inter alia, to shareholders reelecting her to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Lagomasino breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

251.   Additional reasons that demand on Defendant McDonald is futile follow. Defendant McDonald has served as a Company director since May 2021. He also serves as a member of the Compensation Committee. Defendant McDonald has received and continues to receive compensation for his role as a director as described above. In addition, Defendant McDonald solicited the 2022 Proxy Statement, which contained false and misleading elements that contributed, inter alia, to shareholders reelecting him to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant McDonald breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

252.   Additional reasons that demand on Defendant Parker is futile follow. Defendant Parker has served as a Company director since 2016. He also serves as the

Chairman of the Board and is the Chair of both the Compensation Committee and the Governance and Nominating Committee. Defendant Parker has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Parker solicited both the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, inter alia, to shareholders reelecting him to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Parker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

253. Additional reasons that demand on Defendant Rice is futile follow. Defendant Rice has served as a Company director since 2019. He also serves as the Chair of the Audit Committee. Defendant Rice has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Rice solicited both the 2021 and 2022 Proxy Statements, which contained false and misleading elements that contributed, inter alia, to shareholders reelecting him to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Rice breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

254. Additional reasons that demand on the Board is futile follow.

255. Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by millions of

dollars for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

256.   Defendants Catz, deSouza, and Rice (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Disney Code and Disney Standards. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

257.   In violation of the Disney Code, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Disney Code, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Disney Code. Thus, the Director-Defendants

face a substantial likelihood of liability and demand is futile as to them.

258.   Disney has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Disney any part of the damages Disney suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

259.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

260.   The acts complained of herein constitute violations of fiduciary duties owed by Disney's officers and directors, and these acts are incapable of ratification.

261.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Disney. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Disney, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other

hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

262.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Disney to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

263.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

264.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

265.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

266.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements

therein not false or misleading." 17 C.F.R. § 240.14a-9.

267.   Under the direction and watch of the Director-Defendants, both the 2021 and 2022 Proxy Statements failed to disclose, *inter alia*: (1) though the Company claimed its officers and directors adhered to the Standards of Business Conduct and Code of Business Conduct and Ethics for Directors, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2021 and 2022 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

268.   The 2021 and 2022 Proxy Statements also failed to disclose that: (1) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (2) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (3) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (4) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

269.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 and 2022 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 and 2022 Proxy Statements,

including but not limited to the election of the Company's directors.

270.    As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders elected Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Iger, Lagomasino, Parker, and Rice to the Board, allowing them to continue breaching their fiduciary duties to Disney.

271.    As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders elected Defendants Arnold, Barra, Catz, Chang, deSouza, Froman, Iger, Lagomasino, McDonald, Parker, and Rice to the Board, allowing them to continue breaching their fiduciary duties to Disney.

272.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2021 and 2022 Proxy Statements.

273.    Plaintiff, on behalf of Disney, has no adequate remedy at law.

## SECOND CLAIM
### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

274.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

275.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Disney. Not only is Disney now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Disney by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase hundreds of thousands of its own shares at artificially inflated prices, damaging Disney.

276.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct

designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

277. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Disney not misleading.

278. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Disney.

279. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

280. By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

281. Plaintiff, on behalf of Disney, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

282. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

283.   The Individual Defendants, by virtue of their positions with Disney and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Disney and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Disney to engage in the illegal conduct and practices complained of herein.

284.   Plaintiff, on behalf of Disney, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

285.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

286.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Disney's business and affairs.

287.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

288.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Disney.

289.   In breach of their fiduciary duties owed to Disney, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (2) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly

shift costs out of the Disney+ segment; (3) DMED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (4) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

290.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

291.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

292.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase hundreds of thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $14.8 million.

293.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Disney's securities.

294.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Disney's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

295.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

296.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Disney has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

297.   Plaintiff, on behalf of Disney, has no adequate remedy at law.

### FIFTH CLAIM
### Against Individual Defendants for Unjust Enrichment

298.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

299.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Disney.

300.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Disney that was

tied to the performance or artificially inflated valuation of Disney, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

301.   Plaintiff, as a shareholder and a representative of Disney, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

302.   Plaintiff, on behalf of Disney, has no adequate remedy at law.

**SIXTH CLAIM**
**Against Individual Defendants for Abuse of Control**

303.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

304.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Disney, for which they are legally responsible.

305.   As a direct and proximate result of the Individual Defendants' abuse of control, Disney has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

306.   Plaintiff, on behalf of Disney, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against Individual Defendants for Gross Mismanagement**

307.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

308.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary

duties with regard to prudently managing the assets and business of Disney in a manner consistent with the operations of a publicly held corporation.

309. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Disney has sustained and will continue to sustain significant damages.

310. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

311. Plaintiff, on behalf of Disney, has no adequate remedy at law.

## EIGHTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

312. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

313. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

314. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Disney to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

315. In addition, the Individual Defendants caused the Company to repurchase hundreds of thousands of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

316. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

317. Plaintiff, on behalf of Disney, has no adequate remedy at law.

## NINTH CLAIM

**Against Defendants Chapek, McCarthy, and Daniel, for Contribution Under Section 10(b) and 21D of the Exchange Act**

318.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

319.   Disney and Defendants Chapek, McCarthy, and Daniel are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Chapek's, Defendant McCarthy's, and Defendant Daniel's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

320.   Defendants Chapek, McCarthy and Daniel, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

321.   Accordingly, Defendants Chapek, McCarthy, and Daniel are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

322.   As such, Disney is entitled to receive all appropriate contribution or indemnification from Defendants Chapek, McCarthy, and Daniel.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Disney, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Disney;

(c)     Determining and awarding to Disney the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Disney and the Individual Defendants to take all necessary actions to reform and improve Disney's corporate governance and internal procedures to comply with applicable laws and to protect Disney and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Disney to nominate at least six candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Disney restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

1

## **JURY TRIAL DEMANDED**

2

Plaintiff hereby demands a trial by jury.

3

4

    Dated: August 4, 2023                    Respectfully submitted,

5

                                             **THE BROWN LAW FIRM, P.C.**

6

7                                                 */s/Robert C. Moest*                    .
                                             Robert C. Moest, Of Counsel, SBN 62166
8                                            2530 Wilshire Boulevard, Second Floor
9                                            Santa Monica, California 90403
                                             Telephone: (310) 915-6628
10                                           Facsimile: (310) 915-9897
                                             Email: RMoest@aol.com
11

12                                           **THE BROWN LAW FIRM, P.C.**
13                                           Timothy Brown
                                             767 Third Avenue, Suite 2501
14                                           New York, NY 10017
                                             Telephone: (516) 922-5427
15                                           Facsimile: (516) 344-6204
16                                           Email: tbrown@thebrownlawfirm.net

17
                                             *Counsel for Plaintiff*
18

19

20

21

22

23

24

25

26

27

28

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Hugues Gervat, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __ day of July, 2023.

7/18/2023

DocuSigned by:

Hugues Gervat

2F6AF3BA1AB040E...

Hugues Gervat